FILED

14

155

JEFFREY I. WEINBERGER (State Bar No. 56214)
*jeffrey.weinberger@mto.com*
TED G. DANE (State Bar No. 143195)
*ted.dane@mto.com*
HEATHER E. TAKAHASHI (State Bar No. 245845)
*heather.takahashi@mto.com*
RYAN N. HAGGLUND (*pro hac vice application to be submitted*)
*ryan.hagglund@mto.com*
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

TINA W. ARROYO (State Bar No. 272757)
*tina.arroyo@mto.com*
MUNGER, TOLLES & OLSON LLP
560 Mission Street
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Plaintiffs
TAKEDA PHARMACEUTICAL CO., LTD.,
TAKEDA PHARMACEUTICALS U.S.A., INC.,
AND TAKEDA PHARMACEUTICALS
AMERICA, INC.

NC

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CV 13 4001

| | |
|---|---|
| TAKEDA PHARMACEUTICAL CO., LTD., TAKEDA PHARMACEUTICALS U.S.A., INC., AND TAKEDA PHARMACEUTICALS AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MYLAN INC. AND MYLAN PHARMACEUTICALS INC., <br><br> Defendants. | CASE NO. <br><br> **COMPLAINT FOR PATENT INFRINGEMENT** |

FAXED

COMPLAINT FOR PATENT INFRINGEMENT

1   Plaintiffs Takeda Pharmaceutical Company Limited, Takeda Pharmaceuticals U.S.A., Inc.,
2   and Takeda Pharmaceuticals America, Inc. (collectively, "Plaintiffs"), state the following as their
3   Complaint against Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. (collectively,
4   "Defendants"):

## I.

## THE PARTIES

7   1.    Plaintiff Takeda Pharmaceutical Company Limited ("TPC") is a Japanese
8   corporation with a principal place of business at 1-1, Doshomachi 4-chome, Chuo-ku, Osaka,
9   Japan. TPC's business includes the research, development, and marketing of pharmaceutical
10  products.   TPC manufactures dexlansoprazole delayed release capsules.

11  2.    Plaintiff Takeda Pharmaceuticals U.S.A., Inc., formerly known as Takeda
12  Pharmaceuticals North America, Inc. ("TPNA"), is a Delaware corporation with a principal place
13  of business at One Takeda Parkway, Deerfield, IL 60015. TPUSA's business includes the research,
14  development, and marketing of pharmaceutical products. TPUSA is the registered holder of
15  approved New Drug Application No. 22-287. In addition, TPUSA has the exclusive right to import
16  dexlansoprazole delayed release capsules into the United States. TPUSA purchases
17  dexlansoprazole delayed release capsules manufactured by TPC from TPC and imports them into
18  the United States.

19  3.    TPUSA is the owner of record and assignee of U.S. Patent No. 8,173,158 (the "'158
20  Patent") and U.S. Patent No. 8,461,187 (the "'187 Patent") (collectively, the "Asserted Patents").

21  4.    Plaintiff Takeda Pharmaceuticals America, Inc. ("TPA"), is a Delaware corporation,
22  having a principal place of business at One Takeda Parkway, Deerfield, IL 60015. TPA's business
23  includes the purchase, sale, and marketing of pharmaceutical products. TPA has the exclusive right
24  to purchase dexlansoprazole delayed release capsules from TPUSA and sell those capsules to the
25  public in the United States. TPA sells dexlansoprazole delayed release capsules manufactured by
26  TPC that it purchases from TPUSA to the public in the United States.

27
28

2        COMPLAINT FOR PATENT INFRINGEMENT

1       5.      Plaintiffs are informed and believe, and thereupon allege, that Defendant Mylan Inc.

2 is a Pennsylvania corporation with a principal place of business at 1500 Corporate Drive,

3 Canonsburg, Pennsylvania 15317. Plaintiffs are further informed and believe, and thereupon allege,

4 that Defendant Mylan Inc. was formerly known as Mylan Laboratories Inc.

5       6.      Plaintiffs are informed and believe, and thereupon allege, that Defendant Mylan

6 Pharmaceuticals Inc. is a West Virginia corporation with a principal place of business at 781

7 Chestnut Ridge Rd. Morgantown, West Virginia 26505 and is a wholly owned subsidiary of

8 Defendant Mylan Inc. On the basis of Defendant Mylan Inc.'s Form 10-K filed with the United

9 States Securities and Exchange Commission for the fiscal Year ended December 31, 2012,

10 Plaintiffs are informed and believe, and thereupon allege that "[Defendant Mylan Inc.'s] sales in

11 the U.S. are derived principally through [its] wholly owned subsidiary [Defendant] Mylan

12 Pharmaceuticals Inc." Plaintiffs are informed and believe, and thereupon allege, that the acts of

13 Defendant Mylan Pharmaceuticals, Inc. complained of herein were and are aided and abetted by,

14 and done with the cooperation, participation, and assistance of Defendant Mylan Inc. Plaintiffs are

15 further informed and believe, and thereupon allege, that Defendant Mylan Pharmaceuticals Inc. and

16 Defendant Mylan Inc. have officers and/or directors in common.

17       7.      Upon information and belief, Defendants Mylan Pharmaceuticals Inc. and Mylan

18 Inc. are both in the business of, among other things, manufacturing, marketing, and selling generic

19 copies of branded pharmaceuticals throughout the United States.

20       8.      Unless specifically stated otherwise, the acts complained of herein were committed

21 by, on behalf of, and/or for the benefit of Defendants.

22 **II.**

23 **NATURE OF THE ACTION**

24       9.      This is an action for patent infringement. This action relates to an Abbreviated New

25 Drug Application ("ANDA"), ANDA No. 205-205, filed by Defendants with the United States

26 Food and Drug Administration ("FDA") for approval to market generic versions of Plaintiffs'

27 DEXILANT products.

28

3      COMPLAINT FOR PATENT INFRINGEMENT

10.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have been infringing, are infringing, or will infringe one or more claims of each of the Asserted Patents.

### III.

### JURISDICTION AND VENUE

11.     This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. § 271, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12.     This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the privilege of doing business in the State of California and the Northern District of California by continuously and systematically placing goods into the stream of commerce for distribution throughout the United States, including the State of California and Northern District of California, and/or by selling, directly or through their agents, pharmaceutical products in the State of California and the Northern District of California.

13.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have regular and continuous commercial business dealings with representatives, agents, distributors, and customers located in California and the Northern District of California, including the sale of Defendants' products in California and the Northern District of California.  Plaintiffs are informed and believe, and thereupon allege, that on July 1, 2013, Defendant Mylan Inc. provided the certification necessary to show compliance with California Health and Safety Code § 119402. Defendant Mylan Inc.'s website provides that certification at the following URL address: http://investor.mylan.com/declaration.cfm.  Defendant Mylan Inc.'s certification states that "Mylan Inc." includes its subsidiaries in its certification.  Plaintiffs are informed and believed, and thereupon allege, that Defendant Mylan Inc. is registered to do business in California and that under its former name, Mylan Laboratories Inc., Mylan Inc. has filed corporate disclosure statements with the California Secretary of State. Plaintiffs are informed and believe, and thereupon allege, that Defendant Mylan Inc.'s agent for service of process in California is Lawyers Incorporating Service, 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, California 95833.

COMPLAINT FOR PATENT INFRINGEMENT

1 | Defendant Mylan Inc.'s website states: "The bulk of Mylan's product portfolio, which consists of
2 | more than 1000 individual products, includes high quality, more affordable generic medications
3 | sold throughout the world." Defendant Mylan Pharmaceuticals Inc.'s website states: "Mylan
4 | Pharmaceuticals has one of the largest product portfolios in the U.S., consisting of more than 200
5 | products. According to IMS Health, one of every 12 prescriptions dispensed in the U.S. is a Mylan
6 | product." Plaintiffs are informed and believe, and thereupon allege, that Defendant Mylan Inc. has
7 | a wholly owned subsidiary, Mylan Specialty L.P., with a manufacturing facility in Napa,
8 | California.

9 |     14.    Defendant Mylan Pharmaceuticals Inc. is a subsidiary of Mylan, Inc., and its website
10 | contains a link to Defendant Mylan Inc.'s certification pursuant to California Health and Safety
11 | Code § 119402 at the following address: http://investor.mylan.com/declaration.cfm.

12 |     15.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d),
13 | and/or 1400(b).

14 | **IV.**

15 | **INTRADISTRICT ASSIGNMENT**

16 |     16.    For purposes of intradistrict assignment pursuant to Civil Local Rules 3-2(c) and 3-
17 | 5(b), this Intellectual Property Action is to be assigned on a district-wide basis.

18 | **V.**

19 | **FACTUAL BACKGROUND**

20 | **A.    Asserted Patents**

21 |     **1.    The '158 Patent**

22 |     17.    On May 8, 2012, the '158 Patent, entitled "Methods of Treating Gastrointestinal
23 | Disorders Independent of the Intake of Food," was duly and legally issued to TPUSA, as assignee
24 | of named inventors Ronald D. Lee, Majid Vakily, Darcy Mulford, Jing-Tao Wu, and Stuart
25 | Atkinson. A true and correct copy of the '158 Patent is attached as Exhibit A to this Complaint.

26
27
28

COMPLAINT FOR PATENT INFRINGEMENT

1   18.   The expiration date of the '158 Patent listed in the *Approved Drug Products with*

2   *Therapeutic Equivalence Evaluations* (published by the FDA and commonly known as the Orange

3   Book) is March 17, 2030, with an extension for pediatric exclusivity until September 17, 2030.

4             **2.   The '187 Patent**

5   19.   On June 11, 2013, the '187 Patent, entitled "Multiple PPI Dosage Form," was duly

6   and legally issued to TPUSA, as assignee of named inventors Rajneesh Taneja and Majid

7   Vakilynejad. A true and correct copy of the '187 Patent is attached as Exhibit B to this Complaint.

8   20.   The expiration date of the '187 Patent listed in the Orange Book is January 17, 2026,

9   with an extension for pediatric exclusivity until July 17, 2026.

10   **B.   DEXILANT**

11   21.   Plaintiff TPUSA is the registered holder of approved New Drug Application No.

12   22-287 for the manufacture and sale of the drug dexlansoprazole, a proton pump inhibitor, for the

13   treatment of all grades of erosive esophagitis, maintaining healing of esophagitis, and treating

14   heartburn associated with symptomatic non-erosive gastroesophageal reflux disease ("GERD").

15   Plaintiff TPA sells dexlansoprazole in the United States under the trade name DEXILANT, in 30

16   mg and 60 mg dosage forms. The 30 mg and 60 mg dosage forms of DEXILANT were approved

17   by the FDA on January 30, 2009.[1]

18   22.   Plaintiffs are informed and believe, and thereupon allege, that DEXILANT is the

19   first and only acid reflux disease treatment specifically designed for the release of medicine in two

20   stages over time. The key to this two-stage release is DEXILANT's Dual Delayed Release™

21   formulation ("DDR"). DDR combines two different types of granules in one pill. DEXILANT

22   releases one dose of medicine within an hour of taking a pill. Then, around four to five hours after

23   ingestion, DEXILANT releases a second dose of medicine.

24   

25   [1] Plaintiffs originally marketed the drug dexlansoprazole under the proprietary name KAPIDEX.
    On March 4, 2010, the FDA announced that TPNA would start marketing KAPIDEX under the new
26   name DEXILANT to avoid potential confusion with two other medications, CASODEX and
    KADIAN.
27   

28   

COMPLAINT FOR PATENT INFRINGEMENT

1      23.     The Asserted Patents are listed in the Orange Book in support of Plaintiffs'

2   DEXILANT (dexlansoprazole) delayed release capsules, in 30 mg and 60 mg dosage forms.

3      **C.**      **Infringement by Defendants**

4      24.     Plaintiffs are informed and believe, and thereupon allege, that Defendants submitted

5   ANDA No. 205-205 to the FDA under § 505(j) of the Federal Food, Drug and Cosmetic Act (21

6   U.S.C. § 355(j)). The ANDA seeks approval to market dexlansoprazole delayed release capsules in

7   the 30 mg and 60 mg dosage forms (the "ANDA Products") as a generic version of DEXILANT,

8   prior to the expiration dates of the Asserted Patents.

9      25.     Plaintiffs are informed and believe, and thereupon allege, that Abbreviated New

10   Drug Application ("ANDA") No. 205-205 was filed under the name of Defendant Mylan

11   Pharmaceuticals Inc. Plaintiffs are further informed and believe, and thereupon allege, that

12   Defendant Mylan Inc. has and had at all times relevant to this action control over the activities of

13   Defendant Mylan Pharmaceuticals Inc., including Defendant Mylan Pharmaceuticals Inc.'s filing of

14   ANDA No. 205-205 and that Defendant Mylan Inc. was actively involved in the submission of

15   ANDA No. 205-205.

16      26.     On July 19, 2013, TPUSA received a letter dated July 17, 2013 and, on July 22,

17   2013, TPUSA received a materially identical letter dated July 18, 2013 (the "Notice Letters") via

18   overnight delivery from Defendants addressed to TPC, TPUSA, and TPNA. These were the first

19   Notice Letters that any of the Plaintiffs received related to ANDA No. 205-205.

20      27.     On July 22, 2013, TPC received copies of both Notice Letters from Defendants

21   Mylan.

22      28.     The Notice Letters state that the ANDA included a Paragraph IV Certification that,

23   in Defendant Mylan Pharmaceuticals Inc.'s opinion, the '158 patent invalid, unenforceable, and/or

24   will not be infringed by the commercial manufacture, use, or sale of the ANDA Products.

25      29.     Plaintiffs have not received a letter stating that ANDA No. 205-205 includes a

26   Paragraph IV Certification that, in Defendants' opinion, the '187 Patent is invalid, unenforceable,

27   and/or will not be infringed by the commercial manufacture, use, or sale of the ANDA Products.

28

1    30.    Plaintiffs are informed and believe, and thereupon allege, that Defendants have not

2    submitted a certification to the FDA with respect to the '187 Patent, contrary to the requirements of

3    the Hatch-Waxman Act, 21 U.S.C. § 355(j)(2)(A)(vii).

4    31.    Plaintiffs are informed and believe, and thereupon allege, that the ANDA does not

5    provide any valid basis for concluding that the Asserted Patents are invalid, unenforceable, or will

6    not be infringed by the commercial manufacture, use, or sale of the ANDA Products.

7    32.    Plaintiffs are informed and believe, and thereupon allege, that the submission of the

8    ANDA to the FDA constitutes infringement of the Asserted Patents under 35 U.S.C. § 271(e)(2).

9    Moreover, any commercial manufacture, use, offer to sell, sale, or import of the ANDA Products

10   would infringe the Asserted Patents under 35 U.S.C. § 271(a)–(c).

11   33.    Defendants' Notice Letters both fail to comply with the requirements of 21 U.S.C. §

12   355 (j)(2)(B)(iv)(II) because inter alia, they contain very limited information about the generic

13   formulation for which Defendants submitted ANDA No. 205-205. For example, Defendants'

14   Notice Letters do not list the amounts of the ingredients in the ANDA Products.

15   34.    In Defendants' Notice Letters, Defendants purported to offer confidential access to

16   portions of ANDA No. 205-205 to Plaintiffs on terms and conditions set forth in the Notice Letters

17   (the "Mylan Offers"). Defendants requested that Plaintiffs accept the Mylan Offers before

18   receiving access to Defendants' ANDA No. 205-205 and stated that by requesting ANDA No. 205-

19   205, Plaintiffs necessarily accepted the Mylan Offers, including the terms and conditions expressed

20   therein. The Mylan Offers contained unreasonable restrictions, above and beyond those that would

21   apply under a protective order, on who could view the ANDA. For example, the Mylan Offers

22   unreasonably limited access to the ANDA to outside counsel for Plaintiffs at a single law firm, to

23   the exclusion of outside experts and consultants retained by outside counsel, employees of outside

24   counsel, and in-house counsel for Plaintiffs and also unreasonably limited the fields of practice and

25   other activities of outside counsel who accepted access to the ANDA.

26   35.    Under 21 U.S.C. § 355(j)(5)(C)(i)(III), an offer of confidential access "shall contain

27   such restrictions as to persons entitled to access, and on the use and disposition of any information

28

8                    COMPLAINT FOR PATENT INFRINGEMENT

1    accessed, as would apply had a protective order been entered for the purpose of protecting trade
2    secrets and other confidential business information."

3         36.    Since receiving Defendants' Notice Letters and the accompanying Mylan Offers,
4    Plaintiffs have attempted to negotiate with Defendants to procure a copy of ANDA No. 205-205
5    under restrictions "as would apply had a protective order been issued." To that end, on July 29,
6    2013, lead counsel for Plaintiffs, Jeffrey I. Weinberger, sent a letter proposing reasonable
7    alternative terms that would apply had a protective order been issued. Despite repeated attempts by
8    counsel for Plaintiffs to engage in negotiations with Defendants, counsel for Defendants did not
9    engage in any negotiation with Plaintiffs or make a counterproposal prior to August 26, 2013,
10   twenty-eight days after Plaintiffs' proposal was delivered to counsel for Defendants, when counsel
11   for Defendants delivered a counterproposal to counsel for Plaintiffs by electronic mail. Defendants'
12   counterproposal also contained unreasonable restrictions, above and beyond those that would apply
13   under a protective order, on who could view the ANDA. For example, Defendants'
14   counterproposal unreasonably precluded employees of outside counsel from access to the ANDA
15   and also unreasonably limited the fields of practice and other activities of outside counsel who
16   accepted access to the ANDA. On the same day, August 26, 2013, counsel for Plaintiffs delivered
17   a reasonable counterproposal to counsel for Defendants, to which Defendants have not responded.

18        37.    Under the Hatch-Waxman Act, an owner of a patented drug must file an action in
19   federal court within 45 days of receiving a Paragraph IV letter ("45-day window") in order to
20   receive certain benefits under the Act, including a stay of approval of the generic drug for up to 30
21   months during the pendency of litigation, as appropriate. 21 U.S.C. § 355 (c)(3)(c).

22        38.    Plaintiffs are not aware of any other means of obtaining information regarding
23   Defendants' ANDA Products within the 45-day statutory period. In the absence of such
24   information, Plaintiffs resort to the judicial process and the aid of discovery to obtain, under
25   appropriate judicial safeguards, such information as is required to confirm their allegation of
26   infringement and to present to the Court evidence that Defendants ANDA Products fall within the
27   scope of one or more claims of the Asserted Patents.

28

                                          9          COMPLAINT FOR PATENT INFRINGEMENT

1    39.    Plaintiffs commenced this action within 45 days of receiving the first of the Notice

2    Letters.

3    40.    Concomitantly with the commencement of this action, within 45 days of receiving

4    the first of the Notice Letters, Plaintiffs filed an action against Defendants for infringement of

5    additional patents, U.S. Patent Nos. 6,462,058, 6,664,276, 6,939,971, 7,285,668, and 7,790,755, in

6    this District, which is currently pending.

7                                              **VI.**

8                                     **CLAIMS FOR RELIEF**

9                                            **COUNT I**
10                      **(Patent Infringement of U.S. Patent No. 8,173,158)**

         41.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 40 above as
11
     though fully restated herein.
12
         42.    Plaintiffs are informed and believe, and thereon allege, that pursuant to 35 U.S.C.
13
     § 271(e)(2), Defendants' submission of ANDA No. 205-205 to the FDA seeking approval to
14
     engage in the commercial manufacture, use, or sale of the ANDA Products was an act of
15
     infringement of the '158 Patent.
16
         43.    Unless Defendants are enjoined by the Court from the commercial manufacture, use,
17
     offer to sell, or sale within the United States or importation into the United States, Plaintiffs will be
18
     substantially and irreparably harmed by Defendants' infringement of the '158 Patent.  Plaintiffs do
19
     not have an adequate remedy at law.
20
                                            **COUNT II**
21                      **(Patent Infringement of U.S. Patent No. 8,461,187)**

22       44.    Plaintiffs incorporate by reference and reallege paragraphs 1 through 43 above as

23   though fully restated herein.

24       45.    Plaintiffs are informed and believe, and thereon allege, that pursuant to 35 U.S.C.

25   § 271(e)(2), Defendants' submission of ANDA No. 205-205 to the FDA seeking approval to

26   engage in the commercial manufacture, use, or sale of the ANDA Products was an act of

27   infringement of the '187 Patent.

28

                                10                  COMPLAINT FOR PATENT INFRINGEMENT

46.     Unless Defendants are enjoined by the Court from the commercial manufacture, use, offer to sell, or sale within the United States or importation into the United States, Plaintiffs will be substantially and irreparably harmed by Defendants' infringement of the '187 Patent. Plaintiffs do not have an adequate remedy at law.

## COUNT III

**(Declaratory Judgment as to U.S. Patent Nos. 8,173,158 and 8,461,187)**

47.     Plaintiffs incorporate by reference and reallege paragraphs 1 through 46 above as though fully restated herein.

48.     These claims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

49.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have made, and will continue to make, substantial preparation in the United States to manufacture, use, sell, offer to sell, and/or import the ANDA Products prior to patent expiry.

50.     Plaintiffs are informed and believe, and thereupon allege, that Defendants intend to engage in the commercial manufacture, use, sale, or offer for sale within the United States or importation into the United States of the ANDA Products upon receipt of final FDA approval of ANDA No. 205-205.

51.     Pursuant to 35 U.S.C. § 271(a), (b), and/or (c), Defendants' commercial manufacture, use, sale, or offer for sale within the United States or importation into the United States of the ANDA Products would constitute infringement of the '158 and '187 Patents.

52.     Plaintiffs are informed and believe, and thereupon allege, that Defendants' infringing commercial manufacture, use, sale, or offer for sale within the United States or importation into the United States of the ANDA Products complained of herein will begin following FDA approval of ANDA No. 205-205.

53.     Defendants maintain, and Plaintiffs deny, that the Asserted Patents are invalid or unenforceable. Accordingly, there is a real, substantial, and continuing justiciable case or controversy between Plaintiffs and Defendants regarding whether Defendants' commercial manufacture, use, sale, offer for sale, or importation into the United States of the ANDA Products

COMPLAINT FOR PATENT INFRINGEMENT

1    according to ANDA No. 205-205 will infringe one or more claims of the Asserted Patents.

2    Plaintiffs thus are entitled to a declaration that the making, using, sale, offer for sale, and

3    importation into the United States of the ANDA Products according to ANDA No. 205-205

4    infringe one or more claims of the Asserted Patents.

5

**VII.**

6

**PRAYER FOR RELIEF**

7      WHEREFORE, Plaintiffs pray for judgment as follows:

8         A.  For a declaration that Defendants have infringed each of the Asserted Patents;

9         B.  For a declaration that the commercial use, sale, offer for sale, manufacture, and/or

10   importation by Defendants of the ANDA Products would infringe each of the Asserted Patents;

11         C.  For a determination, pursuant to 35 U.S.C. § 271(e)(4)(A), that the effective date

12   for approval of the ANDA, under § 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C.

13   § 355(j)), be no earlier than the expiration date of the last of the Asserted Patents, including any

14   extensions or adjustments;

15         D.  For an order preliminarily and permanently enjoining Defendants and their

16   affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors,

17   assigns, and all those acting for them and on their behalf, or acting in concert with them directly or

18   indirectly, from infringing the Asserted Patents; and

19         E.  For such other and further relief as this Court deems just and proper.

20

21                  Respectfully Submitted,

22

23

24

25

26

27

28

12      COMPLAINT FOR PATENT INFRINGEMENT

1 | DATED: August 28, 2013

MUNGER, TOLLES & OLSON LLP

3 | By: _____

TED G. DANE

Attorneys for Plaintiffs
TAKEDA PHARMACEUTICAL CO., LTD.,
TAKEDA PHARMACEUTICALS U.S.A., INC.,
AND TAKEDA PHARMACEUTICALS
AMERICA, INC.

COMPLAINT FOR PATENT INFRINGEMENT

# Exhibit A

# Exhibit A



US008173158B2

(12) **United States Patent**　　　(10) **Patent No.:**　**US 8,173,158 B2**

Lee et al.　　　(45) **Date of Patent:** 　　May 8, 2012

(54) **METHODS OF TREATING GASTROINTESTINAL DISORDERS INDEPENDENT OF THE INTAKE OF FOOD**

(75) Inventors: **Ronald D. Lee**, Round Lake Beach, IL (US); **Majid Vakily**, Gurnee, IL (US); **Darcy Mulford**, Grayslake, IL (US); **Jing-Tao Wu**, Mundelein, IL (US); **Stuart Atkinson**, Lake Forest, IL (US)

(73) Assignee: **Takeda Pharmaceuticals U.S.A., Inc.**, Deerfield, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 523 days.

(21) Appl. No.: **12/249,258**

(22) Filed: **Oct. 10, 2008**

(65) **Prior Publication Data**

US 2009/0098199 A1　Apr. 16, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/998,754, filed on Oct. 12, 2007.

(51) **Int. Cl.**
　　*A61K 9/48* 　(2006.01)
　　*A61K 9/60* 　(2006.01)
(52) **U.S. Cl.** ......... **424/451**; 424/459; 424/463; 424/490
(58) **Field of Classification Search** ........................ None
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,957,880 A | 10/1960 | Romesh |
| 2,996,431 A | 8/1961 | Barry |
| 4,182,756 A | 1/1980 | Ramsay |
| 4,464,170 A | 8/1984 | Clemens |
| 4,600,577 A | 7/1986 | Didriksen |
| 4,628,098 A | 12/1986 | Nohara et al. |
| 4,728,512 A | 3/1988 | Mehta |
| 4,773,907 A | 9/1988 | Urquhart |
| 4,777,049 A | 10/1988 | Magruder |
| 4,783,337 A | 11/1988 | Wong et al. |
| 4,786,505 A | 11/1988 | Lovgren et al. |
| 4,853,230 A | 8/1989 | Lovgren et al. |
| 4,863,742 A | 9/1989 | Panoz et al. |
| 4,871,549 A | 10/1989 | Ueda |
| 4,894,240 A | 1/1990 | Geoghegan et al. |
| 4,904,476 A | 2/1990 | Mehta et al. |
| 4,980,170 A | 12/1990 | Schneider et al. |
| 5,011,692 A | 4/1991 | Fujioka |
| 5,017,381 A | 5/1991 | Maruyama |
| 5,026,560 A | 6/1991 | Makino et al. |
| 5,045,321 A | 9/1991 | Makino et al. |
| 5,093,132 A | 3/1992 | Makino et al. |
| 5,133,974 A | 7/1992 | Paradissis et al. |
| 5,178,867 A | 1/1993 | Guittard et al. |
| 5,178,878 A | 1/1993 | Wehling et al. |
| 5,229,131 A | 7/1993 | Amidon et al. |
| 5,229,134 A | 7/1993 | Mention et al. |
| 5,260,068 A | 11/1993 | Chen |
| 5,260,069 A * | 11/1993 | Chen ............................ 424/451 |
| 5,264,223 A | 11/1993 | Yamamoto et al. |

| | | |
|---|---|---|
| 5,330,982 A | 7/1994 | Tyers |
| 5,348,748 A | 9/1994 | Sheth et al. |
| 5,401,512 A * | 3/1995 | Rhodes et al. ................ 424/458 |
| 5,431,917 A | 7/1995 | Yamamoto et al. |
| 5,433,959 A | 7/1995 | Makino et al. |
| 5,445,829 A | 8/1995 | Paradissis et al. |
| 5,476,669 A | 12/1995 | Borody |
| 5,516,351 A | 5/1996 | Solomon et al. |
| 5,578,732 A | 11/1996 | Kato et al. |
| 5,582,837 A | 12/1996 | Shell |
| 5,631,020 A | 5/1997 | Okada et al. |
| 5,631,021 A | 5/1997 | Okada et al. |
| 5,639,476 A | 6/1997 | Oshlack et al. |
| 5,639,478 A | 6/1997 | Makino et al. |
| 5,643,607 A | 7/1997 | Okada et al. |
| 5,652,146 A | 7/1997 | Kell |
| 5,656,290 A | 8/1997 | Kelm et al. |
| 5,716,640 A | 2/1998 | Kamei et al. |
| 5,726,316 A | 3/1998 | Crooks et al. |
| 5,753,265 A | 5/1998 | Bergstrand et al. |
| 5,763,396 A | 6/1998 | Weiner et al. |
| 5,807,577 A | 9/1998 | Ouali |
| 5,814,342 A | 9/1998 | Okada et al. |
| 5,817,338 A | 10/1998 | Bergstrand et al. |
| 5,817,388 A | 10/1998 | Hurditch |
| 5,834,024 A | 11/1998 | Heinicke et al. |
| 5,837,284 A | 11/1998 | Mehta et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

DE　　4035455　　11/1990

(Continued)

OTHER PUBLICATIONS

Singh B.N. Modified-release solid formulations for colonic delivery. Recent Patents on Drug Delivery & Formulations (2007) 1:53-65.*
J. Cronlein, K. Fegely, C. Young, and A. Rajabi-Siahboomi. Characterization of Delayed Release Lansoprazole Multiparticulates: Impact of Biorelevant Dissolution Media. 5th World Meeting on Pharmaceutics 2006 (March). Poster Reprint.*
International Search Report for PCT/US08/79520.
Written Opinion of the International Searching Authority for PCT/US08/79520.
Physician's Desk Reference—Lansoprazole (1997)—5 pages.
Arimori et al., J. Pharma. Pharmacology, 50:1241-1254 (1998).
Atwood et al., Chem. Commun., 2736-2377 (2001).
Chemical Abstracts vol. 127, Nos. 1-2 Abstracts 1-28414 (1997) (2 pages).
Chemical & Engineering News, pp. 31-35 (2003).
Barradell et al., "Lansoprazole: a review of its pharmacodynamic and pharmacokinetic properties and its therapeutic efficacy in acid-related disorders," Drugs (1992) 44(2):225-250.

(Continued)

*Primary Examiner* — Robert A Wax

*Assistant Examiner* — Olga V Tcherkasskaya

(74) *Attorney, Agent, or Firm* — Lisa V. Mueller; Michael Best & Friedrich LLP

(57) **ABSTRACT**

The present invention relates to a method of treating a gastrointestinal disorder by administering to a patient in need of treatment thereof a pharmaceutical composition, wherein said pharmaceutical composition can be administered to the patient independent of the intake of food.

**12 Claims, 2 Drawing Sheets**

# US 8,173,158 B2
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,879,708 | A | 3/1999 | Makino et al. |
| 5,889,051 | A | 3/1999 | Chen et al. |
| 5,900,252 | A * | 5/1999 | Calanchi et al. ............ 424/459 |
| 5,945,124 | A | 8/1999 | Sachs et al. |
| 5,948,789 | A | 9/1999 | Larsson et al. |
| 6,036,976 | A | 3/2000 | Takechi et al. |
| 6,096,339 | A | 8/2000 | Ayer et al. |
| 6,110,494 | A | 8/2000 | Clancy et al. |
| 6,126,969 | A | 10/2000 | Shah et al. |
| 6,162,465 | A | 12/2000 | Lippa |
| 6,274,173 | B1 | 8/2001 | Sachs et al. |
| 6,328,994 | B1 | 12/2001 | Shimizu et al. |
| 6,369,085 | B1 | 4/2002 | Cotton et al. |
| 6,462,058 | B1 | 10/2002 | Fujishima et al. |
| 6,605,303 | B1 | 8/2003 | Karehill et al. |
| 6,610,323 | B1 | 8/2003 | Lundberg et al. |
| 6,635,276 | B1 | 10/2003 | Von Falkenhausen |
| 6,635,280 | B2 | 10/2003 | Shell et al. |
| 6,664,276 | B2 | 12/2003 | Fujishima et al. |
| 6,897,205 | B2* | 5/2005 | Beckert et al. ............ 514/159 |
| 6,939,971 | B2 | 9/2005 | Fujishima et al. |
| 6,982,275 | B2 | 1/2006 | Hashimoto et al. |
| 7,147,869 | B2 | 12/2006 | Dietrich et al. |
| 7,169,799 | B2 | 1/2007 | Hashimoto et al. |
| 7,271,182 | B2 | 9/2007 | Kamiyama et al. |
| 7,285,668 | B2 | 10/2007 | Hashimoto et al. |
| 7,339,064 | B2 | 3/2008 | Fujishima et al. |
| 7,569,697 | B2 | 8/2009 | Fujishima et al. |
| 7,737,282 | B2 | 6/2010 | Fujishima et al. |
| 7,790,755 | B2 | 9/2010 | Akiyama et al. |
| 8,030,333 | B2 | 10/2011 | Fujishima et al. |
| 2002/0034541 | A1 | 3/2002 | Valducci |
| 2002/0042433 | A1 | 4/2002 | Yelle et al. |
| 2003/0008903 | A1 | 1/2003 | Barberich et al. |
| 2003/0091630 | A1 | 5/2003 | Louie-Helm et al. |
| 2003/0153766 | A1 | 8/2003 | Hashimoto et al. |
| 2003/0171591 | A1 | 9/2003 | Hashimoto et al. |
| 2003/0181487 | A1 | 9/2003 | Kamiyama et al. |
| 2004/0049045 | A1 | 3/2004 | Hashimoto et al. |
| 2004/0146558 | A1 | 7/2004 | Hirata et al. |
| 2005/0003005 | A1 | 1/2005 | Shimizu et al. |
| 2005/0226929 | A1 | 10/2005 | Xie et al. |
| 2005/0228026 | A1 | 10/2005 | Fujishima et al. |
| 2006/0018964 | A1 | 1/2006 | Combessis et al. |
| 2006/0024362 | A1 | 2/2006 | Seth |
| 2006/0057195 | A1* | 3/2006 | Nonomura et al. ........... 424/464 |
| 2008/0193522 | A1 | 8/2008 | Meier et al. |
| 2008/0193540 | A1 | 8/2008 | Soula et al. |
| 2008/0200482 | A1 | 8/2008 | Petereif et al. |
| 2009/0098199 | A1* | 4/2009 | Lee et al. ........................ 424/451 |
| 2009/0215830 | A1 | 8/2009 | Taneja |
| 2009/0220611 | A1 | 9/2009 | Dargelas et al. |
| 2009/0263475 | A1* | 10/2009 | Manne et al. ................. 424/451 |
| 2010/0068291 | A1 | 3/2010 | Caisse et al. |
| 2010/0272798 | A1 | 10/2010 | Akiyama et al. |
| 2010/0278911 | A1 | 11/2010 | Akiyama et al. |
| 2010/0285120 | A1 | 11/2010 | Akiyama et al. |
| 2011/0189271 | A1* | 8/2011 | Lad et al. ..................... 424/451 |
| 2011/0223244 | A1* | 9/2011 | Liversidge et al. .......... 424/452 |
| 2011/0274752 | A1* | 11/2011 | Cifter et al. .................. 424/465 |
| 2011/0274753 | A1* | 11/2011 | Cifter et al. .................. 424/465 |
| 2011/0274754 | A1* | 11/2011 | Cifter et al. .................. 424/468 |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0274734 | 7/1988 |
| EP | 0694547 | 1/1996 |
| EP | 0924519 | 6/1999 |
| EP | 0960620 | 12/1999 |
| EP | 1044682 | 10/2000 |
| EP | 1607088 | 12/2005 |
| JP | 59227817 | 12/1984 |
| JP | 60-228410 | 11/1985 |
| JP | 2552937 | 12/1991 |
| JP | 2000355540 | 12/2000 |
| JP | 2001122769 | 5/2001 |
| WO | WO 93/18755 | 9/1993 |
| WO | WO 96/01623 | 1/1996 |

| | | |
|---|---|---|
| WO | WO 96/02535 | 2/1996 |
| WO | WO 96/17077 | 6/1996 |
| WO | WO 96/24338 | 8/1996 |
| WO | WO 97/02020 | 1/1997 |
| WO | WO 97/02261 | 1/1997 |
| WO | WO 97/25064 | 7/1997 |
| WO | WO 97/32573 | 9/1997 |
| WO | WO 97/48380 | 12/1997 |
| WO | WO 98/21201 | 5/1998 |
| WO | WO 98/22118 | 5/1998 |
| WO | WO 98/28294 | 7/1998 |
| WO | WO 99/03453 | 1/1999 |
| WO | WO 99/32091 | 7/1999 |
| WO | WO 99/32093 | 7/1999 |
| WO | WO 99/38512 | 8/1999 |
| WO | WO 99/38513 | 8/1999 |
| WO | WO 99/51203 | 10/1999 |
| WO | WO 99/56698 | 11/1999 |
| WO | WO 99/58107 | 11/1999 |
| WO | WO 00/09092 | 2/2000 |
| WO | WO 00/25752 | 5/2000 |
| WO | WO 01/37808 | 5/2001 |
| WO | WO 02/39980 | 5/2002 |
| WO | WO 02/060415 | 8/2002 |
| WO | WO 03/086366 | 10/2003 |
| WO | WO 2004/035020 | 4/2004 |
| WO | WO 2004/035052 | 4/2004 |
| WO | WO 2004/045580 | 6/2004 |
| WO | WO 2004/093875 | 11/2004 |
| WO | WO 2006/009602 | 1/2006 |
| WO | WO 2006/044202 | 4/2006 |
| WO | WO 2006/056712 | 6/2006 |
| WO | WO 2006/122925 | 11/2006 |
| WO | WO 2006/125483 | 11/2006 |
| WO | WO 2007/006353 | 1/2007 |
| WO | WO 2007/036671 | 4/2007 |

## OTHER PUBLICATIONS

Katsuki et al., "Determination of R(+)- and S(−)-Lansoprazole using chiral stationary-phase liquid chromatography and their enantioselective pharmacokinetics in humans," Pharm. Res. (1996) 13(4):611-615.

Nagaya et al., "Effects of the enantiomers of lansoprazole (AG-1749) on H++K+)-ATPase activity in canine gastric microsomes and acid formation in isolated canine parietal cells," Biochem. Pharm. (1991) 42(10):1875-1878.

Sharma, V.K. et al., "Oral pharmacokinetics of omeprazole and lansoprazole after single and repeated doses as intact capsules or as suspensions in sodium bicarbonate," Aliment Pharmacol. Ther. (2000) 14:887-892.

International Search Report and Written Opinion for Application No. PCT/US2005/019028 dated Jun. 13, 2006 (10 pages).

U.S. Appl. No. 11/629,016 dated Nov. 23, 2010 (11 pages).

U.S. Appl. No. 11/629,016 dated Mar. 17, 2010 (9 pages).

Balvanera, A. et al., "A normal coronary arteriogram in a very young man with Prinzmetal's variant angina: case report with review of the literature," Cardiovasc. Dis.,Bulletin of the Texas Heart Institute (1981) 8(4):537-545.

Borner, K. et al., "Separation of lansoprazole enantiomers in human serum by HPLC," Chromat. (1998) 47(3-4):171-175.

Bowler, I.M. et al., "A double blind placebo for lipase comparison of a high lipase and standard pancreatic enzyme preparation in cystic fibrosis," Arch. Dis. In Childhood (1993) 68:227-230.

Brittain, H.G., "Methods for the characterization of polymorphs and solvates," in Polymorphism in Pharmaceutical Solids, Marcel Dekker, Inc., New York (1999) Chapter 6, 227-278.

Concise Encyclopedia, "Polymorphism" H.D. Jakubke et al. editors (1993) 872-873.

Efron et al., "Side effects of methylphenidate and dexamphetamine in children with attention deficit hyperactivity disorder: a double-blind,crossover trial," Pediatrics 100:662-666 (1997).

Figolla, H.R. et al., "Diltiazem improves capacity and exercise capacity in patients with idiopathic dilated cardiomyopathy: results of the diltiazem in dilated cardiomyopathy trial," Circulation (1996) 94(3):346-352.

**US 8,173,158 B2**

Page 3

Gerkensmeier, T. et al., "Self-assembly of 2,8,14,20-tetraisobutyl-5,11,17,23-tetrahydroxyresorc[4]arene," Eur. J. Org. Chem. (1999) 2257-2262.

Gordon, A.J. et al., The Chemist's Companion, A Handbook of Practical Data, Techniques, and References, John Wiley & Sons, New York (1972) 440-445.

Gottdiener, J.S. et al., "Effect of single-drug therapy on reduction of left atrial size in mild to moderate hypertension: comparison of six antihypertensive agents," Circulation (1998) 98:140-148.

Haleblian, J. et al., "Pharmaceutical Applications of Polymorphism," J. Pharm. Sci. (1969) 58(8):911-929.

Handbook of Pharmaceutical Excipients, 4th Edition, R.C. Rowe et al., editors, Pharmaceutical Press, London (2003) 120-124; 301-305; 462-468; 538-540.

Hirschowitz, B.I. et al., "Long-term treatment with lansoprazole for patients with Zollinger-Ellison syndrome," Aliment Pharmacol. Ther. (1996) 10:507-522.

Katsuki, H. et al., "Determination of R(+)- and S(31 )-lansoprazole using chiral stationary-phase liquid chromatography and their enantioselective pharmacokinetics in humans," Pharm. Res. (1996) 13:611-615.

Kotar, B. et al., "Study of polymorphism of a novel antiulcer drug," Poster Session P3: Tuesday Sep. 17, S182.

Lin, A.Y. et al., "Study of crystallization of endogenous surfactant in eudragit NE30D-free films and its influence on drug-release properties of controlled-release diphenhydramine HCI pellets coated with eudragit NE30D," AAPS Pharmsci. (2001) 3:1-12.

Marvola, M. et al., "Enteric polymers as binders and coating materials in multiple-unit site-specific drug delivery systems," Eur. J. Pharm. Sci. (1999) 7:259-267.

Mikawa, K. et al., "Iansoprazole reduces preoperative gastric fluid acidity and volume In children," Can. J. Anaesth. (1995) 42(6):467-472.

Ogura, T. et al., "HPMC capsules—an alternative to gelatin," Pharmacentical Technology Europe (1998) 10(11):32-42.

Physician's Desk Reference, "Prevacid," 55th Edition, Medical Economics Company, Inc., New Jersey (2001) 6 pages.

Remington: The Science and Practice of Pharmacy, 20th Ed., A.R. Gennaro, Editor (2000) p. 897 and 903.

Robinson, M. et al., "Effective maintenance treatment of reflux esophagitis with low-dose lansoprazole. A randomized, double-blind, placebo-controlled trial," Annals of Int. Med. (1996) 124(10):859-867.

Rouhi, A.M., "Concentrates" and "The right stuff. From research and development to the clinic, getting drug crystals right is full of pitfalls," Chemical and Engineering News (2003) 31-35.

Sakamoto, T. et al., "Prolonged action preparation of cefaclor," Jap. J. Antibiotics (1985) 38(3):813-821 (Abstract and figures in English).

Srinivas, N.R. et al., "Enantioselective pharmacokinetics of dl-threo-methylphenidate in humans," Pharm. Res. (1993) 10(1):14-21.

Tietze et al. "Isolation and purification of reaction products," Chapter 1.5 of Reactions and Syntheses in the Organic Chemistry Laboratory (1989) 23-26.

United States Pharmacopeia, The, "Lansoprazole" The National Formulary USP 32, NF 27 (2009) 2:2751-2754.

United States Pharmacopeia, The, "X-ray diffraction," The National Formulary USP 25 NF 20 (2002) 2088-2089.

United States Pharmacopeia, The, "X-ray diffraction," The National Formulary USP23 NF 18 (1995) 1843-1844.

United States Pharmacopeia, The, "X-ray diffraction," The National Formulary USP28 NF 23 (2005) 2513-2514.

Vrecer, F. et al., "Study of influence of temperature and grinding on the crystalline state of lansoprazole," Farm. Vestn. (1997) 242-243—Chemical Abstracts No. 127:362535, 63-Pharmaceuticals (1997) 127(26):751.

Wilkins, C.E. et al., "HIV-associated myocarditis treated with zidovudine (AZT)," Tex Heart Inst. J. (1989) 16:44-45.

Yukawa, E., "Optimisation of antiepileptic drug therapy," Clin. Pharmacokinet. (1996) 31(2):120-130.

Abel, C., et al., "Dexlansoprazole in the treatment of esophagitis and gastroesophageal reflux disease," The Annals of Pharmacotherapy, vol. 44, May, 2010; pp. 871-877.

Lee, R.D., et al., "Clinical trial: the effect and timing of food on the pharmacokinetics and pharmacodynamics of dexlansoprazole MR, a novel dual delayed released formulation of a proton pump inhibitor—evidence for dosing flexibility," Alimentary Pharmacology & Therapeutics, vol. 29, 2009, pp. 824-833.

Metz, D.C., et al., "Review article: dual delayed release formulation of dexlansoprazole MR, a novel approach to overcome the limitations of conventional single release proton pump inhibitor therapy," Alimentary Pharmacology & Therapeutics, vol. 29, 2009, pp. 928-937.

* cited by examiner

FIGURE 1



**U.S. Patent**          May 8, 2012          Sheet 2 of 2          US 8,173,158 B2

FIGURE 2



US 8,173,158 B2

1

## METHODS OF TREATING GASTROINTESTINAL DISORDERS INDEPENDENT OF THE INTAKE OF FOOD

### RELATED APPLICATION INFORMATION

This application claims priority to U.S. Application No. 60/998,754 filed on Oct. 12, 2007, the contents of which are herein incorporated by reference.

### FIELD OF THE INVENTION

The present invention relates to a method of treating a gastrointestinal disorder by administering to a patient in need of treatment thereof a pharmaceutical composition, wherein said pharmaceutical composition can be administered to the patient independent of the intake of food. Specifically, the pharmaceutical composition used in said method comprises at least two solid particles each of which contain at least one proton pump inhibitor.

### BACKGROUND OF THE INVENTION

The stomach is an organ of digestion. It has a saclike shape and is located between the esophagus and the intestines. Almost every animal has a stomach.

The human stomach is a muscular, elastic, pear-shaped bag, lying crosswise in the abdominal cavity beneath the diaphragm. It changes size and shape according to its position within the body and the amount of food inside. The wall of the stomach is lined with millions of gastric glands, which together secrete 400-800 ml of gastric juice at each meal. Three kinds of cells are found in the gastric glands. These cells are parietal cells, "chief" cells and mucus-secreting cells. Parietal cells contain an enzyme known as H⁺/K⁺ adenosine triphosphatase. H⁺/K⁺ adenosine triphosphatase is also referred to as an "acid pump" or "proton pump". This transmembrane protein secretes H⁺ ions (protons) by active transport, using the energy of ATP. The concentration of H⁺ in the gastric juice can be as high as 0.15 M, giving gastric juice a pH less than 1.

Proton pump inhibitors (or "PPIs") are a class of pharmaceutical compounds that inhibit gastric acid secretions by inhibiting H⁺/K⁺ adenosine triphosphatase. It is known in the art that proton pumps can exist in either an active state or a dormant state. PPIs only bind to the active proton pumps. PPIs are metabolized in the parietal cells to active sulfenamide metabolites that inactivate the sulfhydryl group of the proton pump, thereby reducing the hydrogen ion secretion (Langtry and Wilde, "An update of its pharmacological properties and clinical efficacy in the management of acid-related disorders," *Drugs*, 54(3): 473-500 (1997)).

PPIs are frequently prescribed for short-term treatment of active duodenal ulcers, gastric ulcers, gastroesophageal reflux disease (GERD), severe erosive esophagitis, poorly responsive systematic GERD, and pathological hypersecretory conditions such as Zollinger Ellison syndrome. These conditions are caused by an imbalance between acid and pepsin production (aggressive factors), and mucous, bicarbonate and prostaglandin production (defensive factors). The above listed conditions can arise in healthy or critically ill patients, and may be accompanied by significant gastrointestinal bleeding.

Lansoprazole, a PPI, sold commercially under the brand name PREVACID®, is a substituted benzimidazole, 2-[[[3-methyl-4-(2,2,2-trifluoroethoxy)-2-pyridyl]methyl]sulfinyl]] benzimidazole. Lansoprazole is a racemic compound, con-

2

taining a R-enantiomer and a S-enantiomer. The R-enantiomer of lansoprazole, also known as dexlansoprazole, is also a PPI (See, WO 2004/035020).

PPIs are dosed to patients in need of treatment thereof in conjunction with the intake or consumption of food or a meal. For example, the labeling for PREVACID® (lansoprazole) states that PREVACID® "should be taken before eating" and the labeling for NEXIUM® (esomeprazole magnesium), also a PPI, states that "NEXIUM® should be taken at least one hour before meals." Therefore, patients are unable to take PPIs whenever it is convenient for them to do so, but instead must remember to take their medication with the intake or consumption of food or at least one hour before the intake or consumption of food. In order to improve patience compliance, there is a need in the art for pharmaceutical compositions containing PPIs, such as dexlansoprazole, that can be dosed to a patient independently of the intake or consumption of food.

### SUMMARY OF THE INVENTION

In one embodiment, the present invention relates to a method of treating a gastrointestinal disorder in a patient in need of treatment thereof. The method comprises the steps of: administering to said patient a pharmaceutical composition comprising a therapeutically effective amount a proton pump inhibitor, wherein said pharmaceutical composition is capable of being administered to a patient independent of the intake of food.

In another embodiment, the present invention relates to a method of treating a gastrointestinal disorder in a patient in need of treatment thereof. The method comprises the steps of: administering to said patient a pharmaceutical composition comprising a therapeutically effective amount of:

(a) a first solid particle, wherein said first solid particle comprises an active agent and a first enteric coating, wherein the first enteric coating releases the active agent from the solid particle at a pH of about 5.0 to about 5.5; and

(b) a second solid particle, wherein said second solid particle comprises an active agent and a second enteric coating, wherein the second enteric coating releases the active agent from the solid particle at a pH of about 6.2 to about 6.8;

wherein the first solid particle comprises from about 15% to about 50% by weight of the pharmaceutical composition and the second solid particle comprises from about 50% to about 85% by weight of the pharmaceutical composition; and

further wherein said pharmaceutical composition is capable of being administered to a patient independent of the intake of food.

In one another method, the first solid particle can be a granule. Additionally, the second solid particle can be a granule. Preferably, both the first and second solid particles are each granules. Preferably, the pharmaceutical composition is a tablet or capsule.

The active agent in the first solid particle can be dexlansoprazole. The active agent in the second solid particle can be dexlansoprazole. Preferably, the active agent in the first solid particle and the second solid particle is dexlansoprazole.

Preferably, the first enteric coating has a pH of about 5.5 and comprises a methacrylic acid copolymer dispersion. Preferably, the second enteric coating has a pH of about 6.75 and comprises a mixture of a methacrylic copolymer Type B and a methacrylic copolymer Type A in a ratio of 3:1.

US 8,173,158 B2

3

Optionally, the first solid particle comprises a protective layer between the active agent and the first enteric coating. Optionally, the second solid particle comprises a protective layer between the active agent and the second enteric coating. If present, the protective layer can be made from a saccharide, a saccharide starch or any combinations thereof.

In the above method, the first solid particle comprises about 25% of the pharmaceutical composition and the second solid particle comprises about 75% of the pharmaceutical composition.

The gastrointestinal conditions that can be treated pursuant to the above method include, but are not limited to, heartburn, inflammatory bowel disease, Crohn's disease, irritable bowel syndrome, ulcerative colitis, a peptic ulcer, a stress ulcer, a bleeding peptic ulcer, a duodenal ulcer, infectious enteritis, colitis, diverticulitis, gastric hyperacidity, dyspepsia, gastroparesis, Zollinger-Ellison syndrome, gastroesophageal reflux disease, *Helicobacter pylori* associated disease, short-bowel syndrome, hypersecretory states associated with systemic mastocytosis or basophilic leukemia or hyperhistaminemia or combinations of any of the above disorders.

In a second embodiment, the present invention relates to a method of treating a gastrointestinal disorder in a patient in need of treatment thereof. The method comprising the steps of:

administering to said patient a capsule comprising a therapeutically effective amount of:

(a) a first granule, wherein said first granule comprises dexlansoprazole and a first enteric coating, wherein the first enteric coating releases the dexlansoprazole from the granule at a pH of about 5.5; and

(b) a second granule, wherein said second granule comprises dexlansoprazole and a second enteric coating, wherein the second enteric coating releases the dexlansoprazole from the solid particle at a pH of about 6.75;

wherein the first granule comprises about 25% of the capsule and the second granule comprises from about 75% of the capsule; and

further wherein said capsule is capable of being administered to a patient independent of the intake of food.

In the above method, first enteric coating comprises a methacrylic acid copolymer dispersion and the second enteric coating comprises a mixture of a methacrylic copolymer Type B and a methacrylic copolymer Type A in a ratio of 3:1. Additionally, in the above method, the first granule can further comprise a protective layer between the dexlansoprazole and the first enteric coating and the second granule can further comprise a protective layer between the dexlansoprazole and the second enteric coating. The protective layer contained in each of these granules can be made of a saccharide, a saccharide starch or any combinations thereof.

The gastrointestinal conditions that can be treated pursuant to the above method include, but are not limited to, heartburn, inflammatory bowel disease, Crohn's disease, irritable bowel syndrome, ulcerative colitis, a peptic ulcer, a stress ulcer, a bleeding peptic ulcer, a duodenal ulcer, infectious enteritis, colitis, diverticulitis, gastric hyperacidity, dyspepsia, gastroparesis, Zollinger-Ellison syndrome, gastroesophageal reflux disease, *Helicobacter pylori* associated disease, short-bowel syndrome, hypersecretory states associated with systemic mastocytosis or basophilic leukemia or hyperhistaminemia or combinations of any of the above disorders.

## BRIEF DESCRIPTION OF THE FIGURES

FIG. 1 shows the mean plasma TAK-390 MR concentration vs time profiles for each of Regimens A-D as described in Example 2.

4

FIG. 2 illustrates that the intragastric pH results described in Example 2 suggest that the changes in TAK-390 pharmacokinetics under different fasting/fed conditions did not have a relevant effect on the pharmacodynamics of TAK-390MR.

## DETAILED DESCRIPTION OF THE INVENTION

### Definitions

As used in this specification and the appended claims, the singular forms "a," "an" and "the" include plural references unless the context clearly dictates otherwise. Thus, for example, reference to "an active agent" includes a single active agent as well two or more different active agents in combination.

In describing and claiming the present invention, the following terminology will be used in accordance with the definitions set out below.

The terms "active agent," "active ingredient," and "drug" are used interchangeably herein to refer to compounds of the general formula I (below), an alkaline salt thereof, a metabolite thereof or a prodrug thereof, one of the single enantiomers thereof, an alkaline salt thereof (such as, for example, $Mg^{2+}$, $Ca^{2+}$, $Na^+$ or $K^+$ salts), a metabolite thereof or a prodrug thereof or a single enantiomer of the compounds of the general formula I, an alkaline salt of a single enantiomer of compounds of the general formula I, a metabolite of a single enantiomer of compounds of general formula I or a prodrug of a single enantiomer of compounds of general formula I:

formula I

wherein $Het_1$ is

$Het_2$ is

$X$ is

US 8,173,158 B2

| 5 | 6 |

-continued

(Dexlansoprazole)

(Pantoprazole)

(Rabeprazole)

(Tenatoprazole)

wherein

N in the benzimidazole moiety means that one of the ring carbon atoms substituted by $R_6$-$R_9$ optionally may be exchanged for a nitrogen atom without any substituents;

$R_1$, $R_2$ and $R_3$ are the same or different and selected from hydrogen, alkyl, alkoxy optionally substituted by fluorine, alkylthio, alkoxyalkoxy, dialkylamino, piperidino, morpholino, halogen, phenyl and phenylalkoxy;

$R_4$ and $R_5$ are the same or different and selected from hydrogen, alkyl and arylalkyl;

$R_6'$ is hydrogen, halogen, trifluoromethyl, alkyl or alkoxy;

$R_6$-$R_9$ are the same or different and selected from hydrogen, alkyl, alkoxy, halogen, haloalkoxy, alkylcarbonyl, alkoxycarbonyl, oxazolinyl, trifluoroalkyl, a heterocyclic ring that may be further substituted or adjacent groups $R_6$-$R_9$ form ring structures which may be further substituted;

$R_{10}$ is hydrogen; and

$R_{11}$ and $R_{12}$ are the same or different and selected from hydrogen, halogen or alkyl.

Preferred compounds according to formula I are:

(Omeprazole)

(Esomeprazole magnesium)

$Mg^{2+}$ $3H_2O$

(Ilaprazole)

(Lansoprazole)

**7**

The most preferred compound of formula I is dexlansoprazole, the R-enantiomer of lansoprazole.

The terms "administer", "administering", "administered" or "administration" refer to any manner of providing a drug to a subject or patient. Routes of administration can be accomplished through any means known by those skilled in the art. Such means include, but are not limited to, oral, buccal, intravenous, subcutaneous, intramuscular, by inhalation and the like.

As used herein, the term "bioavailability" refers to the rate, extent, and duration with which an active ingredient or drug enters and remains in the general circulation, thereby permitting access to the site of action. Higher bioavailability may be achieved, for example, by increasing the active ingredient or drug's duration of action. Methods to determine the bioavailability of active ingredients or drugs are well known to those of ordinary skill in the art.

As used herein, the term "chronic cough" refers to a cough that last for a period of at least one (1) week, preferably at least two (2) weeks and most preferably at least three (3) weeks. Methods of treating chronic cough using PPIs are disclosed in Chung, *Clinc. Exp. Allergy*, 35:245-246 (2005).

The term "dosage form" refers to any solid object, semi-solid, or liquid pharmaceutical composition designed to contain a specific pre-determined amount (i.e. dose) of a certain active ingredient. Suitable dosage forms may be pharmaceutical drug delivery systems, including those for oral administration, buccal administration, rectal administration, topical or mucosal delivery or subcutaneous implants, or other implanted drug delivery systems and the like. Preferably, the dosage form of the pharmaceutical composition of the present invention is considered to be solid; however, they may contain liquid or semi-solid components.

By an "effective amount" or a "therapeutically effective amount" of a dosage form is meant a nontoxic but sufficient amount of the active ingredient to provide the desired effect. The amount of active ingredient that is "effective" will vary from subject to subject, depending on the age and general condition of the individual, the particular active ingredient or active ingredient, and the like. Thus, it is not always possible to specify an exact "effective amount." However, an appropriate "effective amount" in any individual case may be determined by one of ordinary skill in the art using routine experimentation.

As used herein, the term "gastrointestinal disorder" refers to any disease or disorder of the upper and lower gastrointestinal tract of a patient including, for example, heartburn, inflammatory bowel disease, Crohn's disease, irritable bowel syndrome, ulcerative colitis, peptic ulcers, stress ulcers, bleeding peptic ulcers, duodenal ulcers, infectious enteritis, colitis, diverticulitis, gastric hyperacidity, dyspepsia, gastroparesis, Zollinger-Ellison syndrome, gastroesophageal reflux disease ("GERD") (i.e., acid reflux), including, but not limited to, symptomatic GERD and asymptomatic GERD, *Helicobacter pylori* associated-diseases, hypersecretory states associated with systemic mastocytosis or basophilic leukemia and hyperhistaminemia that result, for example, from neurosurgery, head injury, severe body trauma or burns.

As used herein, the term "lower gastrointestinal tract" refers to the ileum, the colon, the cecum and the rectum.

The term "patient" refers to an animal, preferably a mammal, including a human or non-human. The terms patient and subject may be used interchangeably herein.

By "pharmaceutically acceptable," such as in the recitation of a "pharmaceutically acceptable excipient," or a "pharmaceutically acceptable additive," is meant a material that is not biologically active or otherwise undesirable, i.e., the material

**8**

may be incorporated into a pharmaceutical composition administered to a patient without causing any undesirable biological effects.

As used herein, the term "stabilizer" refers to any chemical, compound or material that minimizes the degradation of the active ingredient or drug by the acidic environment of the stomach. Examples of stabilizers include, but are not limited to, aluminum salts, carbonate or bicarbonate salts of aluminum, Group IA metals or Group IIA metal salts (such as, but not limited to, sodium salts, calcium salts, magnesium salts, etc.), carbonate or bicarbonate salts of Group IA or Group IIA salts (such as a carbonate or bicarbonate salt of sodium, a carbonate or bicarbonate salt of magnesium, a bicarbonate salt of calcium), polymers, sodium alginate, sterols, fatty alcohols and combinations thereof.

Examples of polymers that can be used as stabilizers include, but are not limited to, semipermeable homopolymers, semipermeable copolymers, and the like. Preferably, the polymers cellulose esters, cellulose ethers and cellulose ester-ethers. The cellulosic polymers have a degree of substitution ("DS") of their anhydroglucose unit from greater than 0 up to 3, inclusive. Degree of substitution means the average number of hydroxyl groups originally present on the anhydroglucose unit that are replaced by a substituting group or converted into another group. The anhydroglucose unit can be partially or completely substituted with groups such as acyl, alkanoyl, alkenoyl, aroyl, alkyl, alkoxy, halogen, carboalkyl, alkylcarbamate, alkylcarbonate, alkylsulfonate, alkysulfamate, semipermeable polymer forming groups, and the like.

Examples of semipermeable polymers include a member selected from the group consisting of cellulose acylate, cellulose diacylate, cellulose triacylate, cellulose acetate, cellulose diacetate, cellulose triacetate, mono-, di- and tri-cellulose alkanylates, mono-, di-, and tri-alkenylates, mono-, di-, and tri-aroylates, and the like. Exemplary polymers include cellulose acetate having a DS of 1.8 to 2.3 and an acetyl content of 32 to 39.9%, cellulose diacetate having a DS of 1 to 2 and an acetyl content of 21 to 35%; cellulose triacetate having a DS of 2 to 3 and an acetyl content of 34 to 44.8%, and the like. More specific cellulosic polymers include cellulose propionate having a DS of 1.8 and a propionyl content of 38.5%, cellulose acetate propionate having an acetyl content of 1.5 to 7% and a propionyl content of 39 to 42%, cellulose acetate propionate having an acetyl content of 2.5 to 3%, an average propionyl content of 39.2 to 45%, and a hydroxyl content of 2.8 to 5.4%, cellulose acetate butyrate having a DS of 1.8, an acetyl content of 13 to 15%, and a butyryl content of 34 to 39%, cellulose acetate butyrate having an acetyl content of 2 to 29%, a butyryl content of 17 to 53%, and a hydroxyl content of 0.5 to 4.7%, cellulose triacylates having a DS of 2.6 to 3, such as cellulose trivalerate, cellulose trilamate, cellulose tripalmitate, cellulose trioctanote and cellulose tripropionate, cellulose diesters having a DS of 2.2 to 2.6, such as cellulose disuccinate, cellulose dipalmitate, cellulose dioctanoate, cellulose dicarpylate, and the like; and mixed cellulose esters, such as cellulose acetate valerate, cellulose acetate succinate, cellulose propionate succinate, cellulose acetate octanoate, cellulose valerate palmitate, cellulose acetate heptonate, and the like. Semipermeable polymers are known in U.S. Pat. No. 4,077,407, and they can be synthesized by procedures described in *Encyclopedia of Polymer Science and Technology*, Vol. 3, pp. 325-354 (1964), Interscience Publishers Inc., New York, N.Y.

Semi-permeable polymers comprise cellulose acetaldehyde dimethyl acetate, cellulose acetate ethylcarbamate, cellulose acetate methyl carbamate, cellulose dimethylaminoacetate, semipermeable polyamide, semipermeable

US 8,173,158 B2

9

polyurethanes; semipermeable sulfonated polystyrenes, cross-linked selectively semipermeable polymers formed by the coprecipitation of an anion and a cation, as disclosed in U.S. Pat. Nos. 3,173,876, 3,276,586, 3,541,005, 3,541,006 and 3,546,142, semipermeable polymers, as disclosed by Loeb, et al. in U.S. Pat. No. 3,133,132, semipermeable polystyrene derivatives, semipermeable poly(sodium styrenesulfonate), semipermeable poly(vinylbenzyltrimethylammonium chloride); and semipermeable polymers exhibiting a fluid permeability of $10^{-5}$ to $10^{-2}$ (cc. mil/cm hr·atm), expressed as per atmosphere of hydrostatic or osmotic pressure differences across a semipermeable wall. The polymers known to those skilled in the art are described in U.S. Pat. Nos. 3,845,770, 3,916,899 and 4,160,020; and in *Handbook of Common Polymers*, Scott and Roff (1971) CRC Press, Cleveland, Ohio.

Examples of sterols that can be used as stabilizers include, but are not limited to, phytosterols (such as ergosterols, stigmasterol, sitosterol, brassicasterol and campesterol), zoosterols (such as cholesterol and lanosterol) or combinations thereof.

The fatty alcohols that can be used as stabilizers can be linear, saturated or unsaturated primary alcohols having 10-30 carbon atoms. Examples of fatty alcohols that can be used include, but are not limited to, cetyl alcohol, myristyl alcohol or stearyl alcohol.

The terms "treating" and "treatment" refer to a reduction in severity and/or frequency of symptoms, elimination of symptoms and/or underlying cause, prevention of the occurrence of symptoms and/or their underlying cause, and improvement or remediation of damage. Thus, for example, "treating" a patient involves prevention of a particular disorder or adverse physiological event in a susceptible individual as well as treatment of a clinically symptomatic individual by inhibiting or causing regression of a disorder or disease.

As used herein, the term "ulcers" refers to lesions of the upper gastrointestinal tract lining that are characterized by a loss of tissue. Such ulcers include, but are not limited to, gastric ulcers, duodenal ulcers and gastritis.

As used herein, the term "upper gastrointestinal tract" refers to the esophagus, the stomach, the duodenum and the jejunum.

The fasting pH of the stomach varies between a pH of 2 to 6 (a pH of less than 7 is considered to be an acidic pH). The pH of the small intestine is more alkaline than the pH of the stomach and increases from the duodenum to the ileum. The active ingredient of the present invention, like other PPI's known in the art, is acid labile. It rapidly degrades at an acidic pH to an inactive compound. When a tablet or capsule dissolves in the stomach, this tablet or capsule is thoroughly mixed with the gastric contents of the stomach. Upon transferring from the stomach to the duodenum, the gastric contents are slowly neutralized by bicarbonate present in duodenum. Thus, the pH increases as the gastric contents transition through the small intestine.

The exact location of drug absorption, whether in the stomach, small intestine or throughout the gastrointestinal tract, is uncertain. The inventors of the present invention discovered that the active ingredient exhibits site-specific absorption in the upper part of the small intestine (See Example 4). Specifically, the absorption of the active ingredient is significantly higher in the upper part of the small intestine, namely in the area of the duodenum, in the area of the upper jujenum or a combination of the areas of the duodenum and upper jujenum, where the pH is more acidic.

DESCRIPTION OF THE PRESENT INVENTION

It is known in the art that proton pump inhibitors (PPIs), such as lansoprazole, omeprazole, etc., are orally adminis-

10

tered to patients in connection with the intake of food (such as, for example, at the time of ingesting a meal, such as a breakfast). In fact, the labeling for PREVACID® (lansoprazole) states that PREVACID® "should be taken before eating". By way of another example, the labeling for NEXIUM® (esomeprazole magnesium) states that "NEXIUM® should be taken at least one hour before meals." However, the administration of such PPIs in conjunction with the intake of food decreases the systemic exposure of the PPI. The inventors have discovered a method of treating a patient with a pharmaceutical composition containing at least one PPI, wherein the pharmaceutical composition can be administered to the patient independently of food or meal intake or consumption. The inventors have also discovered that administering the pharmaceutical compositions of the present invention to a patient in need of treatment thereof exhibits unexpected and surprising benefits. Specifically, it is known in the art that the administration of PPI's such as PREVACID® with a high fat meal results in an approximately 50% to 70% decrease in the $C_{max}$ and $AUC_{\infty}$ values, respectively. This is a substantial decrease in the systemic exposure of the PPI after administration with such a high fat meal. Similarly, the administration of NEXIUM° within 15 minutes of a high-fat meal has been shown to have a negative effect on its absorption and bioavailability (both $C_{max}$ and AUC) (See, Sostek M B, et al. *Br J Clin Pharmacol.* 64:386-390 (2007)). However, the inventors have found that the administration of the pharmaceutical compositions of the present invention with a high fat meal leads to an increase in the systemic exposure of the PPI after administration of such a high fat meal. For example, as will be shown herein, the inventors have found that the oral administration of a 90 mg dose of dexlansoprazole with a high fat meal resulted in an approximately 37% increase in the $C_{max}$ and $AUC_{\infty}$ values, respectively.

The methods of the present invention involve administering to a patient in need of treatment thereof a pharmaceutical composition independent of the intake or consumption of food or a meal. The pharmaceutical composition used in the methods of the present invention contains a therapeutically effective amount of at least two different types of solid particles of at least one active agent. Preferably, the solid particles are one or more granules. While the pharmaceutical composition can contain any number of different types of solid particles, it is preferred that the pharmaceutical composition contain at least two different types of solid particles. The particles comprising the pharmaceutical composition can comprise a single active ingredient or can comprise a mixture of one or more active ingredients. Additionally, each of the different particles can contain a different active ingredient. However, it is preferred that at least one particle contains dexlansoprazole as the active ingredient. It is more preferred that each of the particles contained in the pharmaceutical composition contain the same active ingredient, namely, dexlansoprazole. As mentioned above, the pharmaceutical composition contains at least two solid particles.

In one aspect, the first solid particles comprise an active agent and an enteric coating. In another aspect, the second solid particles comprise an active agent and an enteric coating. In yet another aspect, the first solid particles comprise an active agent and a first enteric coating and the second solid particles comprise an active agent (which can be the same or different than the active agent in the first solid particle, but is preferably the same active agent) and a second enteric coating.

The first solid particle contains a core comprising the active agent and optionally, one or more pharmaceutically acceptable stabilizers (such as, but not limited to, magnesium car-

US 8,173,158 B2

**11**

bonate), one or more pharmaceutically acceptable polymers, one or more pharmaceutically acceptable binders (such as hydroxylpropylcellulose) one or more pharmaceutically acceptable disintegrants (such as, but not limited to, sodium carboxymethyl cellulose, calcium carboxymethyl cellulose, sodium cross carboxymethyl cellulose (Ac-Di-Sol, manufactured by FMC International Co., Ltd.), polyvinyl pyrrolidone and low substituted hydroxypropyl cellulose or any combinations thereof) one or more excipients and any combinations thereof. The core can be produced by using routine techniques known in the art such as, but not limited to, direct blending, dry granulation (roller compaction), wet granulation (high shear granulation), milling or sieving, drying (if wet granulation is used), extrusion/spheronization, balling or compression, and, optionally, coating. Alternatively, the core can be formed by spraying the active agent on to an inactive (or inert) carrier or sphere using routine techniques known in the art. Binders can be used when spraying the active agent on to inactive carrier. Inactive carriers or spheres upon which active agents can be sprayed are well known in the art. Specifically, examples of such spheres that can be used, include, but are not limited to, a sphere of sucrose, a sucrose and starch sphere (such as NON-PARIEL-101, NON-PARIEL-105 produced by Freund Industrial Co., Ltd.) or a spherically granulated product of a crystalline cellulose sphere or a crystalline cellulose and lactose. An active agent layer is formed when the active agent is sprayed on to the inactive carrier or sphere.

The solid particle can also contain a protective or intermediate layer between the core and the enteric coating. The purpose of the protective layer is to prevent direct contact of the active agent (or active agent layer) with the enteric coating. The protective layer is formed on and around the core using routine techniques known in the art. For example, the components of the intermediate layer can diluted with purified water and the like and the mixture sprayed in liquid form to coat the core containing the active agent. At the time the protective layer is being applied, a binding agent (also known as a binder), such as hydroxypropylcellulose, can optionally be used (alternatively, the hydroxypropylcellulose can be included in the core as a binder).

The protective layer can be made from saccharides, such as sucrose (purified white sugar (those pulverized (powder sugar) and those not pulverized) and the like), starch saccharide such as, corn starch, lactose, honey and sugar alcohol (such as D-mannitol, erythritol and the like) appropriately compounded with polymeric base materials such as low substituted hydroxypropylcellulose, hydroxypropylcellulose, hydroxypropyl methylcellulose (for example, TC-5 and the like), polyvinyl pyrrolidone, polyvinyl alcohol, methylcellulose and hydroxyethyl methylcellulose as described in WO WO 2004/035020, the contents of which are herein incorporated by reference. One or more pharmaceutically acceptable excipients (such as, but not limited to, one or more film formers (such as Hypromellose 2910), one or more glidants (such as talc), one or more masking agents, one or more pigments (such as titanium dioxide), one or more anti-adherants (such as talc), one or more antistatic agents (such as, titanium oxide, talc and the like) or any combinations thereof can also be added to the protective layer if necessary. The protective layer is applied in the amount of about 0.02 part by weight to about 1.5 parts by weight based on 1 part by weight of the solid particles containing the active agent, and preferably about 0.05 part by weight to about 1 part by weight.

As mentioned above, the first granule also contains a first enteric coating. The first enteric coating surrounds the core and releases the active agent from the solid particle at a pH of about 5.0 to about 5.5. Preferably, the first enteric coating

**12**

releases the active agent from the solid particle at a pH of about 5.5. This first enteric coating that releases the active agent from the solid particle at a pH of about 5.0 to about 5.5 in the proximal and distal segments of the small intestine.

The first enteric coating is coated on and surrounds the core (which may or may not contain a protective layer). Any enteric coating that will result in the release of the active agent at a pH of about 5.0 to about 5.5 can be used in the pharmaceutical composition. An example of a first enteric coating is a methacrylic acid copolymer dispersion, such as EUDRAGIT® L 30 D-55 (Evonik Industries, Germany) and EUDRAGIT® 100-55. Other examples of materials that can be used for the first enteric coating include, but are not limited to, hypromellose phthalate (HP-50 or HP-55), polyvinyl acetate phthalate, cellulose acetate phthalate, hypromellose acetate succinate.

As also mentioned above, the pharmaceutical composition contains at least a second solid particle. The components of the second solid particle are identical to the components described above for the first solid particle (namely, in terms of the core, protective layer, etc). The difference between the first solid particle and the second solid particle is the enteric coating, specifically, the second enteric coating. The second enteric coating surrounds the core and releases the active agent from the solid particle at a pH of about 6.2 to about 6.8. Preferably, the second enteric coating releases the active agent from the solid particle at a pH of about 6.75. The second enteric coating releases the active agent from the solid particle at a pH of about 6.2 to about 6.8 in the more distal segments of the small intestine.

The second enteric coating is coated on and surrounds the core (which may or may not contain a protective layer). Any enteric coating that will result in the release of the active agent at a pH of about 6.2 to about 6.8 can be used in the pharmaceutical composition. An example of a second enteric polymer is mixture of a methacrylic copolymer Type B and a methacrylic copolymer Type A. The methacrylic copolymer Type B and the methacrylic copolymer Type A are in a ratio of 4:1 to 1:4, preferably in a ratio of 3:1. An example of a methacrylic copolymer Type B is EUDRAGIT® S-100 and a methacrylic copolymer Type A is EUDRAGIT® L-100. Another material which can optionally be used as a second enteric coating is hypromellose acetate succinate or a mixture of different grades of hypromellose acetate succinate with varying degrees of substitution, such as those provided for in Table A, below.

TABLE A*

| Grade | pH solubility in McIvaine's Buffer Solution |
|---|---|
| LF** | ≧5.5 |
| MF** | ≧6.0 |
| HF** | ≧6.8 |
| LG | ≧5.5 |
| MG | ≧6.0 |
| AS/HG | ≧6.8 |

*The polymers listed in this Table A are available as Shin-Etsu AQOAT Enteric Coating Agents from Shin-Etsu Chemical Co., Ltd., Japan.
**F is fine power grade (average particle size is about 5 μm).

More specifically, HF grade could be used to obtain a pH of release starting at 6.8. Moreover, the HF or HG grades and MF or MG grades could be mixed in a ratio of 1:3 to obtain a pH of release of the active agent starting at a pH of about 6.2. Release of the active agent at a pH of about 6.5 could be obtained using a 5:3 ratio of HF to MF. Release of the active agent at a pH of about 6.75 could be obtained using a 15:1

US 8,173,158 B2

13

ratio of HF to MF. Release of the active agent at a pH of 6.4 could be obtained using a ratio of 1.1 of HF to MF.

One or more pharmaceutically acceptable excipients (such as, but not limited to, one or more masking agents (such as titanium oxide and the like)), one or more anti-adherents (such as talc), one or more glidants (such as talc), one or more antistatic agents (such as, titanium oxide, talc and the like), one or more pigments (such as titanium dioxide), one or more plasticizers (such as polyethylene glycol, triethyl citrate, etc), or one or more surfactants (such as Polysorbate 80), or any combinations thereof can also be added to the first enteric coating, the second enteric coating or both the first enteric coating and the second enteric coating if necessary. Additional examples of plasticizers and surfactants that can be used are described in WO 2004/035020, the contents of which are herein incorporated by reference.

The amount of the first and second enteric coatings used in the first and second solid particles is about 10% by weight to about 70% by weight based on the total amount of each solid particle before the coating is applied, preferably about 10% by weight to about 50% by weight and more preferably about 15% by weight to about 30% by weight.

The first solid particles are present in the composition in the amount of from about 15% to about 50% by weight of the pharmaceutical composition, preferably about 25% by weight. The second solid particles are present in the pharmaceutical composition in an amount from about 50% to about 85% by weight of the pharmaceutical composition, preferably about 75% by weight. Thereupon, the preferred ratio of the first solid particles to the second solid particles contained in the pharmaceutical composition is 3:1.

As mentioned above, the inventors have found that the administration of the pharmaceutical compositions of the present invention with a high fat meal leads to an increase in the systemic exposure of the active agent after administration of such a high fat meal. While not wishing to be bound by any theory, it is believed that the discovery of this increase in systemic exposure is the result of the second solid particles and their specific interaction with food.

The methods of the present are particularly desirable for use in treating gastrointestinal disorders, particularly, but not limited to, symptomatic GERD, dyspepsia and heart burn. In addition, the methods of the present invention can be used to treat a patient suffering from chronic cough.

Many types of continuous drug release dosage forms are known in the art. For example, controlled or extended release, and pulsed release dosage forms are known. Any type of continuous drug release dosage form can be used in the present invention, including matrix systems, osmotic pumps, and membrane controlled systems (also referred to as reservoir systems). Each of these systems is described in greater detail below. A detailed discussion of such dosage forms may also be found in: (i) *Handbook of pharmaceutical controlled release technology*, ed. D. L. Wise, Marcel Dekker, Inc. New York, N.Y. (2000), and (ii) *Treatise on controlled drug delivery, fundamentals, optimization, and applications*, ed. A. Kydonieus, Marcel Dekker, Inc. New York, N.Y. (1992).

Matrix systems are well known in the art. In a matrix system, the drug is homogenously dispersed in a polymer and optionally, conventional excipients. This so-called admixture is typically compressed under pressure to produce a tablet. The drug is released from this tablet by diffusion and erosion. Matrix systems typically employ a pharmaceutically acceptable polymer such as a water-soluble hydrophilic polymer, or a water insoluble hydrophobic polymer (including waxes). One skilled in the art would readily be able to determine the

14

type of pharmaceutically acceptable polymer to be used using routine techniques to those known in the art.

The pharmaceutical compositions of the present invention also typically include pharmaceutically acceptable excipients. As is well known to those skilled in the art, pharmaceutical excipients are routinely incorporated into solid dosage forms. This typically is done to ease the manufacturing process as well as to improve the performance of the pharmaceutical composition. Common excipients include, but are not limited to, diluents or bulking agents, lubricants, binders, etc.

Diluents, or fillers, can be added to, for example, increase the mass of an individual dose to a size suitable for tablet compression. Suitable diluents include, but are not limited to, powdered sugar, calcium phosphate, calcium sulfate, micro-crystalline cellulose, lactose, mannitol, kaolin, sodium chloride, dry starch, xylitol and sorbitol.

Lubricants can be incorporated into a pharmaceutical composition for a variety of reasons. They reduce friction between the granulation and die wall during compression and ejection. This prevents, for example, a granulate from sticking to the tablet punches, and facilitates its ejection from the tablet punches. Examples of suitable lubricants include, but are not limited to, talc, stearic acid, vegetable oil, calcium stearate, zinc stearate, magnesium stearate, solid polyethylene glycols, sodium stearyl fumarate, silica gel, glyceryl behenate mixtures thereof and other substances with lubricating properties.

Glidant's can also be incorporated into a pharmaceutical composition, typically for purposes of improving the flow characteristics of the granulation. Examples of suitable glidant's include, but are not limited to, talc, silicon dioxide, and cornstarch.

Binders also may be incorporated into the pharmaceutical composition of the present invention. Binders are typically utilized if the manufacture of the dosage form employs a granulation step. Examples of suitable binders include povidone (such as polyvinylpyrrolidone), sugars (such as sucrose), xanthan gum, cellulose gums such as carboxymethylcellulose, methyl cellulose, hypromellose, microcrystalline cellulose, hydroxycellulose, hydroxypropylcellulose, mallodextrin gelatin, starch, pregelatinized starch, and other pharmaceutically acceptable substances with cohesive properties.

Other excipients that may be incorporated into the pharmaceutical composition include absorption accelerators, absorbents, effervescent agents, emulsifers, disintegrating agents, humectants, preservatives, solution retarders, solubility enhancing agents, buffers, surfactants, suspending agents, sweeteners, wetting agents or any other pharmaceutically acceptable excipient commonly used in the pharmaceutical industry.

Examples of "absorption accelerators" that can be used in the present invention include, but are not limited to, quaternary ammonium compounds. Examples of "absorbents" that can be used in the present invention include, but are not limited to, kaolin and bentonite. Examples of "effervescent agents" that can be used in the present invention are effervescent couples such as, but not limited to, an organic acid and a carbonate or bicarbonate. Suitable organic acids include, but are not limited to, citric, tartaric, malic, fumaric, adipic, succinic, and alginic acids and anhydrides and acid salts. Suitable carbonates and bicarbonates include, but are not limited to, sodium carbonate, sodium bicarbonate, potassium carbonate, potassium bicarbonate, magnesium carbonate, sodium glycine carbonate, L-lysine carbonate and arginine carbonate. Examples of "emulsifiers" that can be used in the present invention include, but are not limited to, ethyl alcohol, isopropyl alcohol, ethyl carbonate, ethyl acetate, benzyl alcohol,

**15**

benzyl benzoate, propylene glycol, 1,3-butylene glycol, dimethylformamide, oils, such as cottonseed oil, groundnut oil, corn germ oil, olive oil, castor oil, and sesame oil, glycerol, tetrahydrofurfuryl alcohol, polyethylene glycols, fatty acid esters of sorbitan, or mixtures of these substances, and the like. Examples of "disintegrating agents" that can be used in the present invention include, but are not limited to, lightly cross-linked polyvinyl pyrrolidone, corn starch, potato starch, maize starch and modified starches, agar-agar, calcium carbonate, sodium carbonate, alginic acids, croscarmellose sodium, crospovidone, sodium starch glycolate and mixtures thereof. Examples of "humectants" that can be used in the present invention, include, but are not limited to, glycerol. Examples of "preservatives" that can be used in the present invention include, but are not limited to, potassium sorbate, methylparaben, propylparaben, benzoic acid and its salts, other esters of parahydroxybenzoic acid such as butylparaben, alcohols such as ethyl or benzyl alcohol, phenolic compounds such as phenol or quaternary compounds such as benzalkonium chloride. Examples of "solution retarders" that can be used include in the present invention include, but are not limited to, paraffin. Examples of "solubility enhancing agents" that can be used in the present invention include, but are not limited to, co-solvents such as ethanol or propylene glycol, surfactants and polymeric substances such as polysorbates, polyalkylene glycols, poloxamers or polyvinylpyrrolidone, and oily fatty acids and their mono- or diglyceryl esters such as linoleic acid or glyceryl monolaurate. Examples of suitable "buffers" that can be used in the present invention include, but are not limited to, phosphate, acetate, citrate, succinate and histidine buffers. The term "surfactant" is used in its conventional sense in this invention. Any surfactant is suitable, whether it is amphoteric, non-ionic, cationic or anionic. Examples of suitable surfactants include, but are not limited to, sodium lauryl sulfate, monooleate monolaurate, monopalmitate, monstearate or another ester of polyoxyethylene sorbitane, sodium dioctylsulfosuccinate (DOSS), lecithin, stearylic alcohol, cetostearylic alcohol, cholesterol, polyoxyethylene ricin oil, polyoxyethylene fatty acid glycerides, polyoxyethylene sorbitan fatty acid esters (e.g., the commercially available Tween®s, such as, Tween® 20 and Tween® 80 (ICI Speciality Chemicals)), polyethylene glycols (e.g., Carbowaxs 3550® and 934® (Union Carbide)), poloxamers (e.g., Pluronics F68® and F108®, which are block copolymers of ethylene oxide and propylene oxide); polyoxyethylene castor oil derivatives or mixtures thereof. Examples of "suspending agents" that can be used include in the present invention include, but are not limited to, carboxymethylcelluose, veegum, tragacanth, bentonite, methylcellulose and polyethylene glycols. Examples of "sweeteners" that can be used in the present invention include, but are not limited to, any natural or artificial sweetener such as, but not limited to, sucrose, xylitol, sodium saccharin, cyclamate, aspartame and acsulfame. Examples of flavoring agents are Magnasweet®, bubble gum flavor, fruit flavors and the like. Examples of "wetting agents" that can be used in the present invention include, but are not limited to, ammonium lauryl sulfate and sodium lauryl sulfate.

The amount of excipients used in the pharmaceutical composition will correspond to that typically used in a matrix system. The total amount of excipients, fillers and the like typically will vary from about 10% to about 80% by weight of the pharmaceutical composition.

Matrix dosage forms of pharmaceutical compositions are generally prepared using standard techniques well known in the art. Typically, they are prepared by dry blending the polymer, filler, drug, and other excipients followed by granulating

**16**

the mixture using an alcohol until proper granulation is obtained. The granulation is done by methods known in the art. The wet granules are dried in a fluid bed dryer, sifted and ground to appropriate size. Lubricating agents are mixed with the dried granulation to obtain the final pharmaceutical composition.

In an osmotic pump system, a tablet core is encased by a semipermeable membrane having at least one orifice. The semipermeable membrane is permeable to water, but impermeable to the drug. When the system is exposed to body fluids, water will penetrate through the semipermeable membrane into the tablet core containing osmotic excipients and the active drug. Osmotic pressure increases within the pharmaceutical composition and drug is released through the orifice in an attempt to equalize pressure.

In more complex pumps, the tablet core contains multiple internal compartments. For example, the first compartment may contain the drug and the second compartment may contain a polymer that swells on contact with fluid. After ingestion, this polymer swells into the drug containing compartment at a predetermined rate and forces drug from the pharmaceutical composition at that rate. Such pharmaceutical compositions are often used when a zero order release profile is desired.

Osmotic pumps are well known in the art and have been described in the literature. U.S. Pat. Nos. 4,088,864, 4,200, 098, and 5,573,776, all of which are hereby incorporated by reference, describe osmotic pumps and methods for their manufacture. Osmotic pumps containing compounds, such as omeprazole, have been described in U.S. Pat. No. 5,178,867, the contents of which are hereby incorporated by reference.

As a general guideline, osmotic pumps are typically formed by compressing a tablet of an osmotically active drug (or an osmotically inactive drug in combination with an osmotically active agent or osmagent) and then coating the tablet with a semipermeable membrane that is permeable to an exterior aqueous-based fluid but impermeable to the passage of drug and/or osmagent. One or more delivery orifices may be drilled through the semipermeable membrane wall. Alternatively, orifice(s) through the wall may be formed in situ by incorporating leachable pore forming materials in the wall. In operation, the exterior aqueous based fluid is imbibed through the semipermeable membrane wall and contacts the drug and/or salt to form a solution or suspension of the drug. The drug solution or suspension is then pumped out through the orifice as fresh fluid is imbibed through the semipermeable membrane.

As previously mentioned, osmotic pumps may contain multiple distinct compartments. The first compartment may contain the drug as described above, and the second compartment may contain an expandable driving member consisting of a layer of a swellable hydrophilic polymer, which operates to diminish the volume occupied by the drug, thereby delivering the drug from the device at a controlled rate over an extended period of time. Alternatively, the compartments may contain separate doses of the drug.

Typical materials for the semipermeable membrane include semipermeable polymers known to the art as osmosis and reverse osmosis membranes, such as cellulose acylate, cellulose diacylate, cellulose triacylate, cellulose acetate, cellulose diacetate, cellulose triacetate, agar acetate, amylose triacetate, beta glucan acetate, acetaldehyde dimethyl acetate, cellulose acetate ethyl carbamate, polyamides, polyurethanes, sulfonated polystyrenes, cellulose acetate phthalate, cellulose acetate methyl carbamate, cellulose acetate succinate, cellulose acetate dimethyl aminoacetate, cellulose acetate ethyl carbamate, cellulose acetate chloracetate, cellu-

US 8,173,158 B2

17

lose dipalmitate, cellulose dioctanoate, cellulose dicaprylate, cellulose dipentanlate, cellulose acetate valerate, cellulose acetate succinate, cellulose propionate succinate, methyl cellulose, cellulose acetate p-toluene sulfonate, cellulose acetate butyrate, cross-linked selectively semipermeable polymers formed by the coprecipitation of a polyanion and a polycation as disclosed in U.S. Pat. Nos. 3,173,876; 3,276,586, 3,541, 005, 3,541,006, and 3,546,142, semipermeable polymers as disclosed by Loeb and Sourirajan in U.S. Pat. No. 3,133,132, lightly cross-linked polystyrene derivatives, cross-linked poly(sodium styrene sulfonate), poly(vinylbenzyltrimethyl ammonium chloride), cellulose acetate having a degree of substitution up to 1 and an acetyl content up to 50%, cellulose diacetate having a degree of substitution of 1 to 2 and an acetyl content of 21 to 35%, cellulose triacetate having a degree of substitution of 2 to 3 and an acetyl content of 35 to 44.8%, as disclosed in U.S. Pat. No. 4,160,020.

The osmotic agent present in the pump, which may be used when the drug itself is not sufficiently osmotically active, are osmotically effective compounds soluble in the fluid that enters the pump, and exhibits an osmotic pressure gradient across the semipermeable wall against the exterior fluid. Osmotically effective osmagents useful for the present purpose include magnesium sulfate, calcium sulfate, magnesium chloride, sodium chloride, lithium chloride, potassium sulfate, sodium carbonate, sodium sulfite, lithium sulfate, potassium chloride, sodium sulfate, d-mannitol, urea, sorbitol, inositol, raffinose, sucrose, glucose, hydrophilic polymers such as cellulose polymers, mixtures thereof, and the like. The osmagent is usually present in an excess amount, and it can be in any physical form, such as particle, powder, granule, and the like. The osmotic pressure in atmospheres of the osmagents suitable for the invention will be greater than zero and generally up to about 500 atm, or higher.

The expandable driving member typically is a swellable, hydrophilic polymer which interacts with water and aqueous biological fluids and swells or expands to an equilibrium state. The polymers exhibit the ability to swell in water and retain a significant portion of the imbibed water within the polymer structure. The polymers swell or expand to a very high degree, usually exhibiting a 2 to 50 fold volume increase. The polymers can be cross-linked or may not be cross-linked. The swellable, hydrophilic polymers can be lightly cross-linked, such cross-links being formed by covalent ionic bonds or hydrogen bonds. The polymers can be of plant, animal or synthetic origin. Hydrophilic polymers that can be used in for the present invention include poly(hydroxy alkyl methacrylate) having a molecular weight from 30,000 to 5,000,000; kappa carrageenan, polyvinylpyrrolidone having molecular weight of from 10,000 to 360,000; anionic and cationic hydrogels; polyelectrolyte complexes; poly(vinyl alcohol) having a low acetate residual, cross-linked with glyoxal, formaldehyde, or glutaraldehyde and having a degree of polymerization from 200 to 30,000; a mixture of methyl cellulose; cross-linked agar and carboxymethyl cellulose; a water insoluble, water swellable copolymer produced by forming a dispersion of finely divided copolymer of maleic anhydride with styrene, ethylene, propylene, butylene or isobutylene cross-linked with from 0.001 to about 0.5 moles of saturated cross-linking agent per mole of maleic anhydride in copolymer; water swellable polymers of N-vinyl lactams, and the like.

The term "orifice" as used herein refers to means and methods suitable for releasing the drug from an osmotic system. The expression includes one or more apertures or orifices which have been bored through the semipermeable membrane by mechanical procedures. Alternatively, it may be

18

formed by incorporating an erodible element, such as a gelatin plug, in the semipermeable membrane. In cases where the semipermeable membrane is sufficiently permeable to the passage of drug, the pores in the membrane may be sufficient to release the active ingredient in amounts sufficient to meet the plasma threshold. In such cases, the term "passageway" refers to the pores within the membrane wall even though no bore or other orifice has been drilled there through. A detailed description of osmotic passageways and the maximum and minimum dimensions for a passageway are disclosed in U.S. Pat. Nos. 3,845,770 and 3,916,899, the disclosures of which are incorporated herein by reference.

Osmotic pumps can be manufactured by standard techniques. For example, in one embodiment, the drug and other ingredients that may be housed in one area of the compartment adjacent to the passageway, are pressed into a solid possessing dimension that corresponds to the internal dimensions of the area of the compartment the drug will occupy, or the drug and other ingredients and a solvent are mixed into a solid or semisolid form by conventional methods such as ballmilling, calendaring, stirring or rollmilling, and then pressed into a preselected shape. Next, a layer of a hydrophilic polymer is placed in contact with the layer of drug in a like manner, and the two layers surrounded with a semipermeable wall. The layering of drug formulation and hydrophilic polymer can be fabricated by conventional two-layer press techniques. The wall can be applied by molding, spraying or dipping the pressed shapes into a wall forming material. Another and presently preferred technique that can be use for applying the wall is the air suspension procedure. This procedure consists of suspending and tumbling the pressed agent and dry hydrophilic polymer in a current of air and a wall forming composition until the wall is applied to the agent-hydrophilic polymer composite. The air suspension procedure is described in U.S. Pat. No. 2,799,241; *J. Am. Pharm. Assoc.*, 48:451-459 (1979). Other standard manufacturing procedures are described in *Modern Plastics Encyclopedia*, Vol. 46, pp. 62-70 (1969); and in *Pharmaceutical Sciences*, by Remington, Fourteenth Edition, pp. 1626-1678 (1970), published by Mack Publishing Company, Easton, Pa.

Reservoir systems also are well known in the art. This technology is also commonly referred to as microencapsulation, bead technology, or coated tablets. Particles of the drug are encapsulated with pharmaceutically acceptable polymer. This polymer, and its relative quantity, offers a predetermined resistance to drug diffusion from the reservoir to the gastrointestinal tract. Thus drug is gradually released from the beads into the gastrointestinal tract and provides the desired sustained release of the compound.

These dosage forms of pharmaceutical compositions are well known in the art. U.S. Pat. Nos. 5,286,497 and 5,737, 320, both of which are hereby incorporated by reference, describe such dosage forms and their methods of production. U.S. Pat. Nos. 5,354,556, 4,952,402, and 4,940,588, all of which are hereby incorporated by reference, specifically discuss using such technology to produce sustained release pharmaceutical compositions. As further guidance, however, a pellet is formed with a core of a drug, optionally in association with conventional excipients. This core is then coated with one, or more, pharmaceutically acceptable polymers. Often, the coating polymer is an admixture of a major proportion of a pharmaceutically acceptable water insoluble polymer and a minor proportion of a pharmaceutically acceptable water soluble polymer.

The central core may be prepared by a number of techniques known in the art. Typically the drug is bound to an inert carrier with a conventional binding agent. The inert carrier is

US 8,173,158 B2

19

typically a starch or sugar sphere. Before the drug is bound to the inert carrier, it is typically blended with conventional excipients to expedite its handling and to improve the properties of the final dosage form of the pharmaceutical composition. These excipients are identical to those described above for the matrix systems. The quantity of these excipients can vary widely, but will be used in conventional amounts. The central core is then produced by utilizing a binder or binding agent to attach the powdered drug blend to the solid carrier. This can be accomplished by means known in the art for producing pharmaceutical beads. Suitable means include utilization of a conventional coating pan, an automatic coating machine, or a rotogranulator. The production of these central cores is described in more detail in *Pharmaceutical Pelletization Technology*, ed. I. GhebreSellassie, Marcel Dekker, Inc. New York, N.Y. (1989).

The second major component of a reservoir system is the polymeric coating. As noted above, the polymeric coating is responsible for giving the beads their release characteristics. The polymeric coating may be applied to the central core using methods and techniques known in the art. Examples of suitable coating devices include fluid bed coaters and pan coaters. The application techniques are described in more detail in: i) *Aqueous polymeric coatings for pharmaceutical pharmaceutical compositions*, ed. J. W. McGinity, Marcel Dekker, Inc. New York, N.Y. (1997); and ii) *Pharmaceutical compositions: Tablets* Vol. 3. ed. H. A. Lieberman, L. Lachman and J. B. Schwartz, Marcel Dekker, Inc. New York, N.Y. pp. 77-287, (1990).

Examples of suitable polymers include ethylcellulose, cellulose acetate, cellulose propionate (lower, medium or higher molecular weight), cellulose acetate propionate, cellulose acetate butyrate, cellulose acetate phthalate, cellulose triacetate, poly(methyl methacrylate), poly(ethyl methacrylate), poly(butyl methacrylate), poly(isobutyl methacrylate), poly (hexyl methacrylate), poly(isodecyl methacrylate), poly(lauryl methacrylate), poly(phenyl methacrylate), poly(methyl acrylate), poly(isopropyl acrylate), poly(isobutyl acrylate), poly(octadecyl acrylate), poly(ethylene), poly(ethylene) low density, poly(ethylene) high density, poly(propylene), poly (ethylene oxide), poly(ethylene terephthalate), poly(vinyl isobutyl ether), poly(vinyl acetate), poly(vinyl chloride) or polyurethane or mixtures thereof.

Once the beads have been prepared, they may be filled into capsules as is known in the art. Alternately, they may be pressed into tablets using techniques conventional in the art.

Pulsed release systems, the other broad category of modified release dosage forms of pharmaceutical compositions, are also well known in the art. Pulsed release systems generally involve a first drug release and a second drug release separated by a predetermined period of time or site of release. Pulsed release systems also may include a combination of immediate release and extended release. Multiple formulation configurations are suitable for pulsed release dosage forms of pharmaceutical compositions.

For example, osmotic pumps also are suitable for purposes of pulsatile drug release and have been described in U.S. Pat. Nos. 5,017,381 and 5,011,692, both of which are herein incorporated by reference. Generally, the osmotic pump containing the drug is formed and then overcoated with a layer of a drug to provide for two releases of the drug, one from the coating layer and another from the osmotic pump.

Particle or granule systems have also been proposed for purposes of providing a pulsed release of drug. Systems for the pulsed release of a drug typically use distinct populations of drug containing particles to achieve a pulsed release. The populations employ different coating polymers, such as those

20

mentioned above, to release the drug at different points in time or location. For example, polymers having different dissolution pHs are commonly used for this purpose. Hence, one population of granules can be coated with a polymer that begins dissolving at a pH of 6 and another population of granules can be coated with a polymer that begins dissolving at a pH of 6.5 to achieve a pulsed release. In this manner, the first population of granules would release the drug in the upper small intestine while the second population of the granules would release the drug further down stream and therefore at a later time.

The pharmaceutical compositions of the present invention can be administered orally in the form of tablets, pills, or granules may be loose filled into capsules. The tablets can be prepared by techniques known in the art and contain a therapeutically effective amounts of the active ingredient and such excipients as are necessary to form the tablet by such techniques.

One skilled in the art, taking into account above teachings will be readily able to formulate pharmaceutical compositions containing the at least two solid particles described herein.

As discussed briefly herein, the pharmaceutical compositions of the present invention can be used to treat a patient suffering from a gastrointestinal disorder and in need of treatment thereof. Such a patient can be treated by administering to said patient a the pharmaceutical composition of the present invention containing a therapeutically effective amount of the first and second solid particles. Moreover, the pharmaceutical compositions of the present invention can also be used to treat a patient suffering from chronic cough and in need of treatment thereof. Such a patient can be treated by administering to said patient a pharmaceutical composition of the present invention containing a therapeutically effective amount of the first and second solid particles.

By way of example and not of limitation, examples of the present invention will now be given.

Example I

Dexlansoprazole Capsules

Dexlansoprazole capsules (TAK-390MR capsules) are designed to provide prolonged blood levels of TAK-390. This is accomplished by combining two types of enteric coated granules into one capsule. One type of granule releases drug in the proximal region of the small intestine when the pH reaches approximately 5.0-5.5. The second type of granule releases drug more distally in the intestine when the pH reaches approximately 6.2-6.8. The components of the two types of granules are the same except for the enteric coating layer.

pH 5.0-5.5 Releasing Granules (Granules-LL)

The granules that release at approximately pH 5.0-5.5 are coated with Methacrylic Acid Copolymer Dispersion.

pH 6.2-6.8 Releasing Granules (Granules-H)

The granules that release at approximately pH 6.2-6.8 are coated with a mixture of Methacrylic Acid Copolymer Type A (pH 6 release) and Type B (pH 7 release).

Table 1, below, describes the types of polymers and the proportion of each granule type used in TAK-390MR Capsules.

US 8,173,158 B2

| 21 | 22 |

## TABLE 1

|  | Granule Type | |
|---|---|---|
|  | LL | H |
| pH of release (approximate) | 5.0-5.5 | 6.2-6.8 |
| Polymer Type | Methacrylic acid copolymer dispersion | Mixture of Methacrylic Acid Copolymer Type A and Methacrylic Acid Copolymer Type B |
| Proportion of TAK-390 Dose | 15%-50% by weight | 50-85% by weight % |

### Capsule and Description

The granules are filled into HPMC (hypromellose) capsules.

### Excipients

All excipients except for the HPMC capsules are compendial. None of the ingredients in TAK-390MR capsules is of human or animal origin.

### Composition

The composition of the 30 mg, 60 mg and 90 mg capsules are described in Tables 2 and 3 below. Table 2 provides a range of values for the composition of Granules-LL. Table 3 provides a range of values for the composition of Granules-H.

### TABLE 2

| Component of | Quantity per Capsule (mg) | | |
|---|---|---|---|
| Granules-LL | 30 mg | 60 mg | 90 mg |
| CORE GRANULES |  |  |  |
| TAK-390 | 6.5-8.5 | 14-16 | 21.5-23.5 |
| Sugar Sphere (500 µm to 710 µm) | 12.8-14.9 | 9-11 | 14-16 |
| Stabilizer | 4.5-6.5 | 3-5 | 4-6 |
| Diluent | 5.0-30.0 | 5.0-30.0 | 5.0-30.0 |
| Distintegrant | 3.14-5.15 | 2-4 | 3.5-5.5 |
| Binder | 0.06-0.26 | 0.02-0.22 | 0.08-0.28 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| PROTECTIVE LAYER |  |  |  |
| Film Former | 1.0-5.0 | 1.0-5.0 | 1.0-5.0 |
| Anti-Adherent | 0.4-3.0 | 0.4-3.0 | 0.4-3.0 |
| Pigment | 0.5-3.5 | 0.5-3.5 | 0.5-3.5 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| ENTERIC LAYER-L |  |  |  |
| Pigment | 0.5-2.0 | 0.5-2.0 | 0.5-2.5 |
| Anti-adherent | 1.9-4.0 | 0.9-3.0 | 1.9-5.0 |
| Methacrylic Acid Copolymer Dispersion[*1] | 6.0-12.0[*2] | 6.0-12.0[*2] | 6.0-12.0[*2] |
| Plasticizer | 0.5-2.5 | 0.5-2.5 | 0.5-2.5 |
| Surfactant | 0.1-1.0 | 0.1-1.0 | 0.1-1.0 |
| Solvent[*3] | q.s. | q.s. | q.s. |
| LUBRICATION |  |  |  |
| Antistatic agent | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |
| Glidant | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |

[*1]Lacquer suspension (amount of dry lacquer in suspension is about 30%)
[*2]Amount as dry lacquer substance
[*3]Evaporated during manufacturing

### TABLE 3

| Component-Granules-H | Quantity per capsule (mg) | | |
|---|---|---|---|
|  | 30 mg | 60 mg | 90 mg |
| CORE GRANULES |  |  |  |
| TAK-390 | 21.5-23.5 | 43-46 | 66.5-68.5 |
| Sugar Sphere (500 µm to 710 µm) | 14-16 | 29-31 | 44-46 |
| Stabilizer | 5-7 | 11-13 | 17-19 |
| Diluent | 10.0-50.0 | 10.0-50.0 | 10.0-50.0 |
| Disintegrant | 3.5-6.0 | 8-10 | 12.5-15.0 |
| Binder | 0.10-0.50 | 0.10-.75 | 0.1-1.0 |
| Solvent[*] | q.s. | q.s. | q.s. |
| PROTECTIVE LAYER |  |  |  |
| Film Former | 2.0-15.0 | 2.0-15.0 | 2.0-15.0 |
| Anti-adherent | 1.0-6.0 | 1.0-6.0 | 1.0-6.0 |
| Pigment | 1.3-3.2 | 3.72-5.2 | 6.0-8.1 |
| Solvent[*] | q.s. | q.s. | q.s. |
| ENTERIC LAYER-H |  |  |  |
| Anti-adherent | 9.63-12.0 | 20.26-22.3 | 30.89-33.0 |
| Methacrylic Acid Copolymer Type B | 4.0-16.0 | 8.0-33.0 | 14.0-50.0 |
| Methacrylic Acid Copolymer Type A | 4.0-16.0 | 8.0-33.0 | 14.0-50.0 |
| Plasticizer | 1.12-3.0 | 3.24-5.0 | 5.36-7.5 |
| Dehydrated Alcohol[*] | q.s. | q.s. | q.s. |
| Purified Water[*] | q.s. | q.s. | q.s. |
| LUBRICATION |  |  |  |
| Glidant | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |
| Antistatic agent | 0.01-0.1 | 0.01-0.1 | 0.01-0.1 |

[*]Evaporated during manufacturing

Methods for making Granules-LL and H and filling into capsules are described below.

Methods for Making Dexlansoprazole Granules-LL and H.

Dexlansoprazole Granules-LL

1. Binder is dissolved in solvent by stirring to prepare binder solution.
2. Layering powder consisting of Dexlansoprazole, stabilizer, diluent and disintegrant is prepared by mixing.
3. Sugar Spheres are charged and tumbled in an open rotary granulator.
4. Sugar Spheres are layered with the layering powder while being sprayed with the binder solution.
5. The dried granules are sieved.
6. Pigment is dispersed in solvent using a Dispersing Machine.
7. Film former is dissolved in solvent by stirring.
8. Middle coating solution is prepared by mixing the suspension of pigment, anti-adherent and solvent with the solution of film former using stirrer.
9. The Dexlansoprazole Granules are coated with the middle coating solution in a Fluid Bed Coater.
10. Pigment is dispersed in solvent using a Dispersing Machine.
11. Plasticizer and surfactant are dissolved in solvent by stirring.
12. The enteric coating solution for Granules-LL is prepared by mixing the suspension of pigment, anti-adherent, methacrylic acid copolymer dispersion and solvent with the solution of plasticizer and surfactant using stirrer.
13. Dexlansoprazole Granules are coated with the enteric coating solution for Granules-L in a Fluid Bed Coater.
14. The coated granules are sieved.
15. Dexlansoprazole Granules-LL are mixed with antistatic agent and glidant in a diffusion mixer.

US 8,173,158 B2

**23**

Dexlansoprazole Granules-H

1. Binder is dissolved in solvent by stirring to prepare binder solution.
2. Layering powder consisting of Dexlansoprazole, stabilizer, diluent and disintegrant, is prepared by mixing.
3. Sugar spheres are charged and tumbled in an open rotary granulator.
4. Sugar spheres are layered with the layering powder while being sprayed with the binder solution.
5. The granules are sieved.
6. Pigment is dispersed in solvent using a dispersing machine.
7. Film former is dissolved in solvent by stirring.
8. Middle coating solution is prepared by mixing the suspension of pigment, anti-adherent and solvent with the solution of the film former using stirrer.
9. The Dexlansoprazole Granules are coated with the middle coating solution in a fluid bed coater.
10. The sieved granules are dried in a vacuum dryer.
11. Methacrylic Acid Copolymer Type B, Methacrylic Acid Copolymer Type A and plasticizer are dissolved in a mixture of dehydrated alcohol and purified water by stirring.
12. The enteric coating solution for Granules-His prepared by mixing anti-adherent and the solution of Methacrylic Acid Copolymer Type B, Methacrylic Acid Copolymer Type A, plasticizer, dehydrated alcohol and purified water using stirrer.
13. The granules are coated with the enteric coating solution for Granules-H in a fluid bed coater.
14. The coated granules are sieved.
15. Dexlansoprazole Granules-H are mixed with antistatic agent and glidant in a diffusion mixer.

Dexlansoprazole Capsules

Dexlansoprazole Granules-LL and Dexlansoprazole Granules-H are filled into capsules using an encapsulator.

### Example 2

The Effect and Timing of Food on the Pharmacokinetics and Pharmacodynamics of TAK-390MR: Evidence for Dosing Flexibility

Introduction

Proton pump inhibitors (PPIs) bind only to actively secreting proton pumps; therefore, dosing guidelines generally recommend that PPIs be administered 30 to 60 minutes prior to a meal, such that drug is available when maximal stimulation of parietal cell activity occurs. However, dosing of esomeprazole within 15 minutes of a high-fat breakfast has been shown to have a negative effect on its absorption and bioavailability (both $C_{max}$ and AUC) (See, Sostek M B, et al. *Br J Clin Pharmacol.* 64:386-390 (2007)). Fifty-four percent (54%) of patients with poorly controlled GERD dose their PPIs suboptimally in relation to meals. Therefore, a PPI that can be administered without regard to food intake would offer dosing flexibility and could have a positive effect on compliance.

Purpose of Study

The purpose of this study was to evaluate the effect of food on the pharmacokinetics (PK) and pharmacodynamics (PD) of TAK-390 after a single oral dose of TAK-390 MR 90 mg, made as described in Example 1.

Methods

Study Design

This study was a phase 1, open-label, randomized, single-dose, 4-way crossover study conducted at a single center. Healthy adult subjects were randomized on Day 1 of Period 1 to 1 of 4 sequence groups that determined the order in which patients received the 4 different dosing regimens (See, Table

**24**

4, below). During each of the 4 crossover periods, subjects received a single dose of placebo on Day 1 and a single dose of TAK-390MR 90 mg on Day 3 at about 8:00 AM after an overnight fast. There was a minimum washout interval of at least 5 days between the last dose in a period and the first dose in the subsequent period.

Inclusion Criteria

Healthy male and female subjects aged 18-55 years with negative *H. pylori* test results at screening were eligible to participate in this study.

Pharmacokinetic Evaluations and Statistical Analyses

The PK profile of TAK-390MR was assessed through blood sampling before dosing and over a 24-hour period after dosing on Day 3 of each period. PK parameters for TAK-390 were estimated using standard noncompartmental methods and include: $t_{lag}$=time delay between drug administration and first observed concentration above the lower limit of quantitation; $t_{max}$=time to reach the observed maximum plasma concentration; $C_{max}$=observed maximum plasma concentration; and AUC=area under the plasma concentration vs time curve from time zero the last quantifiable concentration ($AUC_t$) and from time zero to infinity ($AUC_\infty$).

Statistical assessments of the food effect (fed regimens B, C, or D) relative to the fasting regimen (A) were made via point estimates and 90% CIs for the ratios for $C_{max}$, $AUC_t$, and $AUC_\infty$, for TAK-390. It was concluded that food had no effect if the 90% CIs for the ratios from the 2 regimens were within the bioequivalency range of 0.80 and 1.25.

Pharmacodynamic Evaluations and Statistical Analyses

Pharmacologic response was measured for each regimen on Days 1 and 3 of each period with 24-hour continuous intragastric pH monitoring using a Medtronic Digitrapper™ pH recorder (Medtronic, Inc., Minneapolis, Minn.).

Two PD parameters, mean intragastric pH and % time pH>4 over 24 hours post dose, were calculated using the medians of pH measurements during 15-minute intervals. The values for Day 1 were treated as baseline of each regimen.

For each regimen, PD parameters at baseline (Day 1) and Day 3, as well as changes from baseline, were summarized using descriptive statistics.

ANOVA models on changes in PD parameters from baseline to Day 3 were used to assess the effect of the changes in the PK of TAK-390 on PD under different fasting/fed conditions. The statistical significance level for the tests was 0.05.

Safety Evaluation

Safety was monitored through adverse event (AE) reports, concomitant medication use, 12-lead electrocardiograms, physical examinations, vital sign assessments, and laboratory evaluations.

Results

Demographics

Forty-six of forty-eight subjects who were randomized to the 4 sequence groups and completed at least 2 dosing regimens were included in the PK and PD analyses. All 48 subjects were included in the safety analyses. They were primarily men (60%) and ranged in age from 19-53 years (mean±SD=32±11 years). Seventy-seven percent (77%) were white and twenty-three percent (23%) were black. Their mean±SD height was 172±10 cm, and their mean±SD weight was 76±12 kg.

Pharmacokinetics

When TAK-390MR was administered in the fed state (Regimen B), the $t_{lag}$ for TAK-390 was delayed by a mean of ~1 hour, and the $t_{max}$ was delayed by a mean of ~2 hours compared with administration of TAK-390MR in the fasting state (Regimen A) (See, Table 5, below). When TAK-390MR

US 8,173,158 B2

**25**

was administered 5 minutes (Regimen C) or 30 minutes (Regimen D) before a high-fat breakfast, mean TAK-390 $t_{lag}$ and $t_{max}$ values were similar to those obtained when TAK-390MR was administered in the fasting state (Regimen A). Mean TAK-390 $C_{max}$ and AUC, values increased 17-31% when TAK-390MR was administered in the fed state (Regimen B) or 5 minutes before a meal (Regimen C), but was bioequivalent when administered 30 minutes before a meal (Regimen D) compared with administration in the fasted state (Regimen A) (See, Table 6, below). The mean plasma TAK-390 concentration vs time profiles for each regimen are shown in FIG. 1.

Pharmacodynamics

Overall, the intragastric pH results suggest that the changes in TAK-390 PK under different fasting/fed conditions did not have a relevant effect on the PD of TAK-390MR (See, Table 7 and FIG. 2). There were no statistically significant differences among any of the pairwise comparisons of the fed regimens with the fasting regimen for the change from baseline (Day 3 minus Day 1) over the 24-hour postdose interval for mean intragastric pH. The only statistically significant difference that occurred in the pairwise comparisons was between fed (Regimen B) and fasted (Regimen A) for the percentage of time with intragastric pH>4; the difference between the 2 regimens was 8%.

Safety

No consistent, clinically important changes were observed in any of the study safety parameters when TAK-390MR was administered under fasting or various fed conditions. Nineteen subjects (40%) experienced at least 1 treatment-emergent adverse event (AE); there was little difference among the regimens in the number of subjects experiencing at least 1 AE. No deaths or serious AEs occurred, but 1 subject prematurely discontinued due to an AE (hepatic enzyme increase) during the washout interval following Period 1 in Regimen C.

**CONCLUSIONS**

There was a significant but modest increase in TAK-390 exposure following administration of TAK-390MR under various fed conditions compared with the fasting state (12-31% increase in $C_{max}$; 9-12% increase in the AUCs). The changes in TAK-390 PK following dosing under different fasting/fed conditions did not produce relevant differences in intragastric pH. The pH results indicate that TAK-390MR can be administered without regard to food or the timing of food. A PPI that can be administered without regard to food intake offers improved dosing flexibility and can have a positive effect on compliance.

TABLE 4

Treatment Sequences and Dosing Regimens

| Regimen | Timing of Dose of TAK-390MR 90 mg or Placebo |
|---|---|
| A | Dosed under fasting conditions |
| B | Fed State: Dosed 30 min after the start of a high-fat breakfast |
| C | Dosed 5 min before a high-fat breakfast |
| D | Dosed 30 min before a high-fat breakfast |

**26**

TABLE 5

Summary of the Effect of Food and Timing of Food on PK Parameter Estimates Following a Single Oral Dose of TAK-390MR

| Regimen | Measure | $t_{lag}$ h | $t_{max}$ h | $C_{max}$ ng/mL | AUC, ng·h/mL | AUC$_\infty$ ng·h/mL |
|---|---|---|---|---|---|---|
| A | N | 46 | 46 | 46 | 46 | 37 |
| | Mean | 0.87 | 5.38 | 1486 | 6996 | 7058 |
| | CV % | 70 | 36 | 54 | 53 | 53 |
| B | n | 46 | 46 | 46 | 46 | 37 |
| | Mean | 1.91 | 7.63 | 1825 | 7999 | 8157 |
| | CV % | 45 | 24 | 36 | 48 | 49 |
| C | n | 46 | 46 | 46 | 46 | 37 |
| | Mean | 0.49 | 5.94 | 1653 | 7975 | 8198 |
| | CV % | 136 | 41 | 43 | 47 | 48 |
| D | n | 46 | 46 | 46 | 46 | 37 |
| | Mean | 0.53 | 4.73 | 1597 | 7448 | 7970 |
| | CV % | 92 | 60 | 48 | 52 | 50 |

TABLE 6

Bioavailability of TAK-390 Following a Single Oral Dose of TAK-390MR Administered Under Various Fed Conditions Relative to Administration Under Fasting Conditions

| PK Parameter | Point Estimate | 90% CI |
|---|---|---|
| | Regimen B vs Regimen A (Reference) | |
| $C_{max}$ | 1.3065 | 1.1735-1.4547 |
| AUC, | 1.1901 | 1.1249-1.2591 |
| AUC$_\infty$ | 1.2050 | 1.1449-1.2683 |
| | Regimen C vs Regimen A (Reference) | |
| $C_{max}$ | 1.1684 | 1.0494-1.3009 |
| AUC, | 1.1910 | 1.1257-1.2600 |
| AUC$_\infty$ | 1.2096 | 1.1484-1.2740 |
| | Regimen D vs Regimen A (Reference) | |
| $C_{max}$ | 1.1165 | 1.0026-1.2432 |
| AUC, | 1.0903 | 1.0305-1.1535 |
| AUC$_\infty$ | 1.1483 | 1.0887-1.2112 |

TABLE 7

Analysis of Mean Intragastric pH and Percentage of Time With Intragastric pH >4 During the Total 24-hour Postdose Time Interval on Day 1 (Placebo) and on Day 3 (TAK-390MR) and of the Change From Baseline (Day 3 Minus Day 1)

| | Result for Each Dosing Regimen | | | | P Value[c] for Pairwise Comparison | | |
|---|---|---|---|---|---|---|---|
| Regimen | A | B | C | D | B vs A[b] | C vs A[b] | D vs A[b] |
| | Mean Intragastric pH | | | | | | |
| Day 1 (Placebo) | 2.28 | 2.27 | 2.19 | 2.41 | 0.97 | 0.57 | 0.38 |
| Day 3 (TAK-390MR) | 4.46 | 4.25 | 4.43 | 4.53 | 0.09 | 0.71 | 0.60 |
| Δ from Baseline (Day 3 Minus Day 1)$ | 2.18 | 1.97 | 2.24 | 2.13 | 0.25 | 0.81 | 0.70 |
| | % Time Intragastric pH >4 | | | | | | |
| Day 1 (Placebo) | 17 | 18 | 16 | 19 | 0.90 | 0.55 | 0.55 |
| Day 3 (TAK-390MR) | 64 | 57 | 62 | 66 | <0.01** | 0.22 | 0.54 |

**27**

TABLE 7-continued

Analysis of Mean Intragastric pH and Percentage of Time With
Intragastric pH >4 During the Total 24-hour Postdose Time
Interval on Day 1 (Placebo) and on Day 3 (TAK-390MR) and
of the Change From Baseline (Day 3 Minus Day 1)

| | Result for Each Dosing Regimen | | | | P Value[c] for Pairwise Comparison | | |
|---|---|---|---|---|---|---|---|
| Regimen | A | B | C | D | B vs A[b] | C vs A[b] | D vs A[b] |
| Δ from Baseline (Day 3 Minus Day 1)$ | 47 | 39 | 46 | 47 | 0.02* | 0.64 | 0.99 |

$Adjusting for the effect of the breakfast timing relative to dosing on pH
[c]P values are from an ANOVA with effects for regimen, sequence, period, and subject nested within sequence.
[b]Regimen A was defined as the reference regimen.

One skilled in the art would readily appreciate that the present invention is well adapted to carry out the objects and obtain the ends and advantages mentioned, as well as those inherent therein. The molecular complexes and the methods, procedures, treatments, molecules, specific compounds described herein are presently representative of preferred embodiments, are exemplary, and are not intended as limitations on the scope of the invention. It will be readily apparent to one skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention.

All patents and publications in the specification are indicative of the levels of those skilled in the art to which the invention pertains. All patents and publications are herein incorporated by reference to the same extent as if each individual publication was specifically and individually indicated to be incorporated by reference.

The invention illustratively described herein suitably may be practiced in the absence of any element or elements, limitation or limitations which is not specifically disclosed herein. Thus, for example, in each instance herein any of the terms "comprising," "consisting essentially of" and "consisting of" may be replaced with either of the other two terms. The terms and expressions which have been employed are used as terms of description and not of limitation, and there is no intention that in the use of such terms and expressions of excluding any equivalents of the features shown and described or portions thereof, but it is recognized that various modifications are possible within the scope of the invention claimed. Thus, it should be understood that although the present invention has been specifically disclosed by preferred embodiments and optional features, modification and variation of the concepts herein disclosed may be resorted to by those skilled in the art, and that such modifications and variations are considered to be within the scope of this invention as defined by the appended claims.

In addition, where features or aspects of the invention are described in terms of Markush groups, those skilled in the art will recognize that the invention is also thereby described in terms of any individual member or subgroup of members of the Markush group. For example, if X is described as selected from the group consisting of bromine, chlorine, and iodine, claims for X being bromine and claims for X being bromine and chlorine are fully described.

**28**

What is claimed is:

1. A method of treating heartburn, acid reflux or gastroesophageal reflux disease in a patient in need of treatment thereof, the method comprising the steps of:
   a) obtaining a pharmaceutical composition comprising dexlansoprazole from a group of pharmaceutical compositions comprising proton pump inhibitors; and
   b) administering to a patient suffering from heartburn, acid reflux or gastroesophageal reflux, regardless of whether the patient is under fasted or fed conditions, a therapeutically effective amount of the pharmaceutical composition obtained in step a), wherein the pharmaceutical composition comprises: (i) a first solid particle, wherein said first solid particle comprises dexlansoprazole and a first enteric coating, wherein the first enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 5.0 to about 5.5; and (ii) a second solid particle, wherein said second solid particle comprises dexlansoprazole and a second enteric coating, wherein the second enteric coating releases the proton pump inhibitor from the solid particle at a pH of about 6.2 to about 6.8; wherein the first solid particle comprises from about 15% to about 50% by weight of the pharmaceutical composition and the second solid particle comprises from about 50% to about 85% by weight of the pharmaceutical composition.

2. The method of claim 1, wherein the first enteric coating has a pH of about 5.5.

3. The method of claim 1, wherein the second enteric coating has a pH of about 6.75.

4. The method of claim 1, wherein the changes in pharmacokinetics after administration to the patient of a single dose of a therapeutically effective amount of the pharmaceutical composition comprising dexlansoprazole under fasting or fed conditions does not produce statistically significant changes in intragastric pH.

5. The method of claim 1, wherein the patient is suffering from heart burn.

6. The method of claim 1, wherein the patient is suffering from acid reflux.

7. The method of claim 1, wherein the patient is suffering from gastroesophageal reflux.

8. The method of claim 1, wherein the pharmaceutical composition comprising dexlansoprazole is in the form of a tablet or a capsule.

9. The method of claim 1, wherein the administration of the composition to a human subject in a fed state is bioequivalent to administration of the composition to a human subject in a fasted state.

10. The method of claim 9, wherein bioequivalency of the composition is established by a 90% Confidence Interval for AUC which is between 0.80 and 1.25.

11. The method of claim 9, wherein bioequivalency of the composition is established by a 90% Confidence Interval for $C_{max}$, which is between 0.80 and 1.25.

12. The method of claim 1, wherein the pharmaceutical composition comprising dexlansoprazole administration provides a mean intragastric pH of between about 4.2 and about 4.5 on day 3 following administration regardless of whether the dexlansoprazole was administered in a fed or fasted state.

* * * * *

# Exhibit B

# Exhibit B



US008461187B2

(12) **United States Patent**
Taneja et al.

(10) **Patent No.:** **US 8,461,187 B2**
(45) **Date of Patent:** **Jun. 11, 2013**

(54) **MULTIPLE PPI DOSAGE FORM**

(75) Inventors: **Rajneesh Taneja**, Libertyville, IL (US);
**Majid Vakilynejad**, Pleasant Prarie, WI
(US)

(73) Assignee: **Takeda Pharmaceuticals U.S.A., Inc.,**
Deerfield, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 230 days.

(21) Appl. No.: **11/629,016**

(22) PCT Filed: **Jun. 1, 2005**

(86) PCT No.: **PCT/US2005/019028**
§ 371 (c)(1),
(2), (4) Date: **Nov. 7, 2008**

(87) PCT Pub. No.: **WO2006/009602**
PCT Pub. Date: **Jan. 26, 2006**

(65) **Prior Publication Data**
US 2009/0215830 A1     Aug. 27, 2009

**Related U.S. Application Data**

(60) Provisional application No. 60/580,265, filed on Jun.
16, 2004.

(51) **Int. Cl.**
*A01N 43/40*     (2006.01)
*A61K 9/26*     (2006.01)

(52) **U.S. Cl.**
USPC ........................................... **514/338**; 424/469

(58) **Field of Classification Search**
USPC ........................................................ 514/338
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 2,957,880 A | 10/1960 | Romesh |
| 2,996,431 A | 8/1961 | Barry |
| 4,182,756 A | 1/1980 | Ramsay |
| 4,464,170 A | 8/1984 | Clemens |
| 4,600,577 A | 7/1986 | Didriksen |
| 4,628,098 A | 12/1986 | Nohara et al. |
| 4,728,512 A | 3/1988 | Mehta |
| 4,773,907 A | 9/1988 | Urquhart |
| 4,777,049 A | 10/1988 | Magruder |
| 4,783,337 A | 11/1988 | Wong et al. |
| 4,786,505 A | 11/1988 | Lovgren et al. |
| 4,853,230 A | 8/1989 | Lovgren et al. |
| 4,863,742 A | 9/1989 | Panoz et al. |
| 4,871,549 A | 10/1989 | Ueda |
| 4,894,240 A | 1/1990 | Geoghegan et al. |
| 4,904,476 A | 2/1990 | Mehta et al. |
| 4,980,170 A | 12/1990 | Schneider et al. |
| 5,011,962 A | 4/1991 | Staiger et al. |
| 5,017,381 A | 5/1991 | Maruyama |
| 5,026,560 A | 6/1991 | Makino et al. |
| 5,045,321 A | 9/1991 | Makino et al. |
| 5,093,132 A | 3/1992 | Makino et al. |
| 5,133,974 A | 7/1992 | Paradissis et al. |

| | | |
|---|---|---|
| 5,178,867 A | 1/1993 | Guittard et al. |
| 5,178,878 A | 1/1993 | Wehling et al. |
| 5,229,131 A | 7/1993 | Amidon et al. |
| 5,229,134 A | 7/1993 | Mention et al. |
| 5,260,068 A | 11/1993 | Chen |
| 5,260,069 A | 11/1993 | Chen |
| 5,264,223 A | 11/1993 | Yamamoto et al. |
| 5,330,982 A | 7/1994 | Tyers |
| 5,348,748 A | 9/1994 | Sheth et al. |
| 5,401,512 A | 3/1995 | Rhodes et al. |
| 5,431,917 A | 7/1995 | Yamamoto et al. |
| 5,433,959 A | 7/1995 | Makino et al. |
| 5,445,829 A | 8/1995 | Paradissis et al. |
| 5,476,669 A | 12/1995 | Borody |
| 5,516,351 A | 5/1996 | Solomon et al. |
| 5,578,732 A | 11/1996 | Kato et al. |
| 5,582,837 A | 12/1996 | Shell |
| 5,631,020 A | 5/1997 | Okada et al. |
| 5,631,021 A | 5/1997 | Okada et al. |
| 5,639,476 A | 6/1997 | Oshlack et al. |
| 5,639,478 A | 6/1997 | Makino et al. |
| 5,643,607 A | 7/1997 | Okada et al. |
| 5,652,146 A | 7/1997 | Kell |
| 5,656,290 A | 8/1997 | Kelm et al. |
| 5,716,640 A | 2/1998 | Kamei et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2383306 | 4/2001 |
|---|---|---|
| CA | 2536902 | 3/2005 |

(Continued)

OTHER PUBLICATIONS

V.K. Sharma et al., "Oral pharmacokinetics of omeprazole and
lansoprazole after single and repeated doses as intact capsules or as
suspensions in sodium bicarbonate", Aliment Pharmacol Ther 2000;
14: 887-892, XP-001181327.
Search Report and Written Opinion from PCT/US2005/019028
dated Jun. 13, 2006.
Katsuki et al., "Determination of R(+)- and S(−)-Lansoprazole Using
Chiral Stationary-Phase Liquid Chromatography and Their
Enantioselective Pharmacokinetics in Humans," Pharmaceutical
Research, vol. 13, No. 4, pp. 611-615 (1996).
Barradell et al., "Lansoprazole: A Review of its Pharmacodynamic
and Pharmacokinetic Properties and its Therapeutic Efficacy in Acid-
Related Disorders," Drugs, 44(2), pp. 225-250, 1992.
Nagaya, et al., "Effects of the Enantiomers of Lansoprazole (AG-
1749) on (H+ + K+)-ATPase Activity in Canine Gastric Microsomes
and Acid Formation in Isolated Canine Parietal Cells," Biochemical
Pharmacology, vol. 42, No. 10, pp. 1875-1878 (1991).

(Continued)

*Primary Examiner* — Melenie McCormick
*Assistant Examiner* — Timothy E Betton
(74) *Attorney, Agent, or Firm* — Lisa V. Mueller; Michael
Best & Friedrich, LLP

(57) **ABSTRACT**

Herein provided are dosage forms (variously referred to as
"formulations") comprising a PPI that is released from the
dosage form as a first and a second dose. Each dose of PPI is
present in an amount sufficient to raise the plasma levels of
the PPI to at least 100 ng/ml.

**19 Claims, 1 Drawing Sheet**

**US 8,461,187 B2**
Page 2

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,726,316 A | 3/1998 | Crooks et al. |
| 5,753,265 A | 5/1998 | Bergstrand et al. |
| 5,763,396 A | 6/1998 | Weiner et al. |
| 5,807,577 A | 9/1998 | Ouali |
| 5,814,342 A | 9/1998 | Okada et al. |
| 5,817,338 A | 10/1998 | Bergstrand et al. |
| 5,834,024 A | 11/1998 | Heinicke et al. |
| 5,837,284 A | 11/1998 | Mehta et al. |
| 5,879,708 A | 3/1999 | Makino et al. |
| 5,889,051 A | 3/1999 | Chen et al. |
| 5,900,252 A | 5/1999 | Calanchi et al. |
| 5,945,124 A | 8/1999 | Sachs et al. |
| 5,948,789 A | 9/1999 | Larsson et al. |
| 6,036,976 A | 3/2000 | Takechi et al. |
| 6,096,339 A | 8/2000 | Ayer et al. |
| 6,110,494 A | 8/2000 | Clancy et al. |
| 6,126,969 A | 10/2000 | Shah et al. |
| 6,162,463 A | 12/2000 | Lippa |
| 6,274,173 B1 | 8/2001 | Sachs et al. |
| 6,328,994 B1 | 12/2001 | Shimizu et al. |
| 6,369,085 B1 | 4/2002 | Cotton et al. |
| 6,462,058 B1 | 10/2002 | Fujishima et al. |
| 6,605,303 B1 | 8/2003 | Karehill et al. |
| 6,610,323 B1 | 8/2003 | Lundberg et al. |
| 6,635,276 B1 | 10/2003 | Von Falkenhausen |
| 6,635,280 B2 | 10/2003 | Shell et al. |
| 6,664,276 B2 | 12/2003 | Fujishima et al. |
| 6,780,436 B1 | 8/2004 | Lopez-Cabrera et al. |
| 6,897,205 B2 | 5/2005 | Beckert et al. |
| 6,939,971 B2 | 9/2005 | Fujishima et al. |
| 6,982,275 B2 | 1/2006 | Hashimoto et al. |
| 7,147,869 B2 | 12/2006 | Dietrich et al. |
| 7,169,799 B2 | 1/2007 | Hashimoto et al. |
| 7,271,182 B2 | 9/2007 | Kamiyama et al. |
| 7,285,668 B2 | 10/2007 | Hashimoto et al. |
| 7,339,064 B2 | 3/2008 | Fujishima et al. |
| 7,569,697 B2 | 8/2009 | Fujishima et al. |
| 7,737,282 B2 | 6/2010 | Fujishima et al. |
| 7,790,755 B2 | 9/2010 | Akiyama et al. |
| 8,030,333 B2 | 10/2011 | Fujishima et al. |
| 8,173,158 B2 | 5/2012 | Lee et al. |
| 2001/0008900 A1 | 7/2001 | Cederberg et al. |
| 2002/0034541 A1 | 3/2002 | Valducci |
| 2002/0042433 A1 | 4/2002 | Yelle et al. |
| 2003/0008903 A1 | 1/2003 | Barberich et al. |
| 2003/0091630 A1 * | 5/2003 | Louie-Helm et al. ......... 424/468 |
| 2003/0152627 A1 | 8/2003 | Beckert et al. |
| 2003/0153766 A1 | 8/2003 | Hashimoto et al. |
| 2003/0171591 A1 | 9/2003 | Hashimoto et al. |
| 2003/0181487 A1 | 9/2003 | Kamiyama et al. |
| 2004/0049045 A1 | 3/2004 | Hashimoto et al. |
| 2004/0146558 A1 | 7/2004 | Hirata et al. |
| 2005/0003005 A1 | 1/2005 | Shimizu et al. |
| 2005/0226929 A1 | 10/2005 | Xie et al. |
| 2005/0228026 A1 | 10/2005 | Fujishima et al. |
| 2006/0018964 A1 | 1/2006 | Combessis et al. |
| 2006/0024362 A1 | 2/2006 | Seth |
| 2006/0057195 A1 | 3/2006 | Nonomura et al. |
| 2008/0193522 A1 | 8/2008 | Meier et al. |
| 2008/0193540 A1 | 8/2008 | Soula et al. |
| 2008/0200482 A1 | 8/2008 | Petereit et al. |
| 2009/0098199 A1 | 4/2009 | Lee et al. |
| 2009/0215830 A1 | 8/2009 | Taneja |
| 2009/0220611 A1 | 9/2009 | Dargelas et al. |
| 2009/0263475 A1 | 10/2009 | Manne et al. |
| 2010/0068921 A1 | 3/2010 | Richter |
| 2010/0272798 A1 | 10/2010 | Akiyama et al. |
| 2010/0278911 A1 | 11/2010 | Akiyama et al. |
| 2010/0285120 A1 | 11/2010 | Akiyama et al. |
| 2011/0189271 A1 | 8/2011 | Lad et al. |
| 2011/0223244 A1 | 9/2011 | Liversidge et al. |
| 2011/0274752 A1 | 11/2011 | Cifter et al. |
| 2011/0274753 A1 | 11/2011 | Cifter et al. |
| 2011/0274754 A1 | 11/2011 | Cifter et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2557791 | 10/2005 |
| DE | 4035455 | 11/1990 |
| EP | 0274734 | 7/1988 |
| EP | 0694547 | 1/1996 |
| EP | 0924519 | 6/1999 |
| EP | 0960620 | 12/1999 |
| EP | 1044682 | 10/2000 |
| EP | 1 607 088 | 12/2005 |
| JP | 59-227817 | 12/1984 |
| JP | 60-228410 | 11/1985 |
| JP | 2552937 | 12/1991 |
| JP | 2000355540 | 12/2000 |
| JP | 2001122769 | 5/2001 |
| JP | 2002501895 | 1/2002 |
| WO | 91/07172 | 5/1991 |
| WO | 9318755 | 9/1993 |
| WO | 96/01623 | 1/1996 |
| WO | 96/02535 | 2/1996 |
| WO | 96/17077 | 6/1996 |
| WO | 96/24338 | 8/1996 |
| WO | 97/02020 | 1/1997 |
| WO | 97/02261 | 1/1997 |
| WO | 97/25064 | 7/1997 |
| WO | 97/32573 | 9/1997 |
| WO | 97/48380 | 12/1997 |
| WO | 9748380 | 12/1997 |
| WO | 98/21201 | 5/1998 |
| WO | 98/22118 | 5/1998 |
| WO | 98/28294 | 7/1998 |
| WO | 99/03453 | 1/1999 |
| WO | 99/26698 | 6/1999 |
| WO | 99/32091 | 7/1999 |
| WO | WO 99/32093 | 7/1999 |
| WO | 99/38511 | 8/1999 |
| WO | 99/38512 | 8/1999 |
| WO | 9938513 | 8/1999 |
| WO | 99/51203 | 10/1999 |
| WO | 9958107 | 11/1999 |
| WO | 0009092 | 2/2000 |
| WO | 0025752 | 5/2000 |
| WO | 0137808 | 5/2001 |
| WO | 0239980 | 5/2002 |
| WO | 02/060415 | 8/2002 |
| WO | 03086366 | 10/2003 |
| WO | 2004035020 | 4/2004 |
| WO | 2004035052 | 4/2004 |
| WO | 2004045580 | 6/2004 |
| WO | 2004/082665 | 9/2004 |
| WO | 2004093875 | 11/2004 |
| WO | 2006009602 | 1/2006 |
| WO | 2006044202 | 4/2006 |
| WO | 2006056712 | 6/2006 |
| WO | 2006122925 | 11/2006 |
| WO | 2006125483 | 11/2006 |
| WO | 2007006353 | 1/2007 |
| WO | 2007036671 | 4/2007 |

## OTHER PUBLICATIONS

Abel, C. et al., "Dexlansoprazole in the treatment of esophagitis and gastroesophageal reflux disease," The Annals fo Pharmacotherapy, (2010) 44:871-877.

Arimori et al., "Pharmacokinetic differences between Lansoprazole enantiomers in rats," J. Pharma. Pharmacology (1998) 50:1241-1254.

Atwood, J.L. et al., "Hydrogen-bonded molecular capsules are stable in polar media," Chem. Commun. (2001) 2736-2377.

Balvanera, A. et al., "A normal coronary arteriogram in a very young man with Prinzmetal's variant angina: case report with review of the literature," Cardiovas. Dis. Bulletin of the Texas Heart Institute (1981) 8(4):537-545.

Borner, K. et al., "Separation of lansoprazole enantiomers in human serum by HPLC," Chromat. (1998) 47 (3-4):171-175.

Bowler, I.M. et al., "A double blind lipase for lipase comparison of a high lipase and standard pancreatic enzyme preparation in cystic fibrosis," Arch. Dis. In Childhood (1993) 68:227-230.

**US 8,461,187 B2**

Page 3

Brittain, H.G., "Methods for the characterization of polymorphs and solvates," in Polymorphism in Pharmaceutical Solids, Marcel Dekker Inc., New York (1999) Chapter 6, 227-278.

Concise Encyclopedia," Polymorphism" Jakubke et al. editors (1993) 872-873.

Cronlein, K. et al., "Characterization of delayed release lansoprazole multiparticulates: impact of biorelevant dissolution media," 5th World Meeting on Pharmaceutics (2006), poster reprint.

Efron, D. et al., "Side effects of methylphenidate and dexamphetamine in children with attention deficit hyperactiviy disorder: a double-blind, crossover trial," Pediatrics (1997) 100:662-666.

Figulla, H.R. et al., "Diltiazem improves cardiac function and exercise capacity in pateitns with idiopathic dilated cardiomyopathy: results of the diltiazem in dilated cardiomyopathy trial," Circ. (1996) 94(3):346-352.

Gerkensmeier, T. et al., "Self-assembly of 2,8,14,20-tetraisobutyl-5,11,17,23-tetrahydroxyresorc[4]arene," Eur. J. Org. Chem. (1999) 2257-2262.

Gordon, A.J. et al., The Chemist's Companion, A Handbook of Practica Data, Techniques, and References, John Wiley & Sons, New York (1972) 440-445.

Gottdiener, J.S. et al., "Effect of single-drug therapy on reduction of left atrial size in mild to moderate hypertension: comparison of six antihypertensive agents," Circulation (1998) 98:140-148.

Haleblian, J. et al., "Pharmaceutical applications of polymorphism," J. Pharm. Sci. (1969) 58(8):911-929.

Handbook of Pharmaceutical Excipients, Cellulose Acetate Phthalate, 4th Edition, R.C. Rowe et al., editors, Pharmaceutical Press, London (2003) 120-124; 301-305; 462-468; 538-540.

Hirschowitz, B.I. et al., "Long-term treatment with lansoprazole for patients with Zollinger-Ellison syndrome," Aliment Pharmacol. Ther. (1996) 10:507-522.

International Search Report and Written Opinion for Application No. PCT/US08/79520 dated Dec. 23, 2008.

Kotar, B. et al., "Study of polymorphism of a novel antinlcer drug," Poster Session P3: Tuesday Sep. 17, 1996, S182.

Lee, R.D. et al., "Clinical trial: the effect and timing of food on the pharmacokinetics and pharmacodynamics of dexlansoprazole MR, a novel duel delayed released formulation of a proton pump inhibitor—evidence for dosing flexibility," Alimentary Pharmacology & Therapeutics (2009) 29:824-833.

Lin, A.Y. et al., "Study of crystallization of endogenous surfactant in eudragit NE30D-free films and its influence on drug-release properties of controlled-release diphenhydramine HCI pellets coated with eudragit NE30D," AAPS Pharmsci. (2001) 3:1-12.

Marvola, M. et al., "Enteric polymers as binders and coating materials in multiple-unit site-specific drug delivery systems," Eur. J. Pharm. Sci. (1999) 7:259-267.

Metz, D.C. et al., "Review article: dual delayed release formulation of dexlansoprazole MR, a novel approach to overcome the limitations of conventional single release proton pump inhibitor therapy," Alimentary Pharmacology & Therapeutics (2009) 29:928-937.

Mikawa, K. et al., "Lansoprazole reduces preoperative gastric fluid acidity and volume in children," Can. J. Anaesth. (1995) 42(6):467-472.

Ogura, T. et al., "HPMC Capsules—an alternative to gelatin," Pharm. Technology Europe (1998) 10(11):32-42.

Physician's Desk Reference, "Lansoprazole" (1997) 5 pages.

Physician's Desk Reference, "Prevacid," 55th Edition, Medical Economics Company, Inc., New Jersey (2001) 6 pages.

Remington: the Science and Practice of Pharmacy, 20th Edition, A.R. Gennaro, Editor (2000) 897 and 903.

Robinson, M. et al., "Effective maintenance treatment of reflux esophagitis with low-dose lansoprazole. A randomized, double-blind, placebo-controlled trial," Annals of Int. Med. (1996) 124(10):859-867.

Rouhi, A.M., "Concentrates and the right stuff. From research and development to the clinic, getting drug crystals right is full of pitfalls," Chem. Engineering News (2003) 31-35.

Sakamoto, T. et al., "Prolonged action preparation of cefaclor," Jap J. Antibiotics (1985) 38(3):813-821.

Singh, B.N., "Modified-release solid formulations for colonic delivery," Recent Patents on Drug Delivery & Formations (2007) 1:53-65.

Srinivas, N.R. et al., "Enantioselective pharmacokinetics of dl-threo-methylphenidate in humans," Pharm. Res. (1993) 10(1):14-21.

Tietze et al., "Isolation and purification of reaction products," Chapter 1.5 of Reactions and Syntheses in the Organic Chemistry Laboratory (1989) 23-26.

United States Pharmacopeia, "Lansoprazole" the National Formulary USP 32, NF 27 (2009) 2:2751-2754.

United States Pharmacopeia, "X-ray diffraction," The National Formulary USP 25 NF 20 (2002) 2088-2089.

United States Pharmacopeia, "X-ray diffraction," The National Formulary USP23 NF 18 (1995) 1843-1844.

United States Pharmacopeia, "X-ray diffraction," The National Formulary USP28 NF 23 (2005) 2513-2514.

Vrecer, F. et al., "Study of influence of temperature and grinding on the crystalline state of lansoprazole," Farm. Vestn (1997) 242-243.

Vrecer, F. et al., "Study of influence of temperature and grinding on the crystalline state of lansoprazole," Chemical Abstract No: 127:362535h (1997) 127(1-2).

Wilkins, C.E. et al., "HIV-associated myocarditis treated with zidovudine (AZT)," Tex. Heart Inst. J. (1989) 16:44-45.

Yukawa, E., "Optimisation of antiepileptic drug therapy," Clin. Pharmacokinet. (1996) 31(2):120-130.

* cited by examiner



US 8,461,187 B2

1

## MULTIPLE PPI DOSAGE FORM

This application is a 371 of PCT/US 2005/019028, filed on Jun. 1, 2005, which claims the benefit of 60/580,265 filed on Jun. 16, 2004.

### TECHNICAL FIELD

The present invention relates to proton pump inhibitors and in particular, relates to dosage forms containing multiple doses of a proton pump inhibitor.

### BACKGROUND OF THE INVENTION

Proton pump inhibitors (or "PPIs") are a class of pharmaceutical compounds that inhibit gastric acid secretions by inhibiting H+/K+ adenosine triphosphate, an enzyme present in parietal cells found in the gastric lining of the stomach. H+/K+ adenosine triphosphate is variously referred to as an "acid pump" or "proton pump" and examples of PPI's include lansoprazole, omeprazole, and pantoprazole. PPIs rapidly degrade in acidic environments and therefore, dosage forms containing PPIs generally are designed to protect the PPI from the acidic environment of the stomach. Specifically, such dosage forms are designed such that a single dose of the PPI is released in the upper small intestine where the PPI can be absorbed.

Peak plasma concentrations for PPIs typically occur within 1-3 hours after ingestion, and the half-life of such drugs is generally short, usually less than 2 hours. Notwithstanding the relatively quick peak plasma levels and half-lives associated with PPIs, a prolonged therapeutic effect is attained regardless of their relatively short pharmacokinetic half life. In fact, the therapeutic effect of PPIs does not directly correlate with serum concentrations of these drugs. Accordingly, patients on PPI therapy are generally only required to take a single dosage form containing a daily dose of a PPI, usually prior to breakfast. Unfortunately, although the therapeutic effect of these drugs is longer than would otherwise be anticipated, some patients on PPI therapy experience a nocturnal break through event where the secretory activity of the proton pumps return. As a result, the acidity in the stomach increases and the discomfort associated with the increased acid returns.

Unfortunately, it currently does not appear that there is a solution to the nocturnal breakthrough phenomenon associated with PPIs. There is therefore a need for a dosage form containing a PPI that reliably can provide a full day of therapeutic effect while being administered on a once a day basis.

### SUMMARY OF THE INVENTION

The present invention provides dosage forms comprising a PPI that is released from the dosage form as a first and a second dose. Each dose of PPI is present in an amount sufficient to raise the plasma levels of the PPI to at least 100 ng/ml. The PPI may be released from the dosage form as discreet pulses of the drug that are separated by a pre-selected period of time. Alternatively, the first and second doses may be separated by little or no time delay, and therefore provide a continuous release of the PPI over a pre-selected time period. The invention also provides methods of treating gastrointestinal disorders with the dosage forms mentioned above.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a graph derived from the modeling technique employed in example 1.

2

### DETAILED DESCRIPTION OF THE INVENTION

Notwithstanding attempts to mitigate the so-called nocturnal breakthrough events associated with current PPI dosage forms and regimens, there is still no means for successfully helping the significant population of patients that experience this unpleasant phenomenon commonly associated with PPI therapy. It has unexpectedly and surprisingly been discovered that the breakthrough phenomenon can be mitigated through appropriate use of pharmacokinetic properties of these drugs to establish effective concentrations of the PPI. In particular, it has been found that it is not sufficient merely to provide an additional dose of a PPI sometime after a first daily dose and before nighttime. The appropriate means for alleviating the breakthrough phenomenon is a function of the concentration of the PPI in a patient. Applicants have discovered that there is a threshold concentration of these drugs that must be surpassed in a second dose of the PPI before a therapeutic effect is achieved. Moreover, the first and the second dose can be administered in a single oral dosage form that can be taken once a day to alleviate nocturnal breakthrough events.

Hence, the present invention provides a dosing regimen and dosage form comprising a first dose of a PPI and a second dose of a PPI such that each dose of the PPI is in an amount sufficient to achieve a therapeutic effect and thereby alleviate the nocturnal breakthrough phenomenon. Any PPI is suitable for use in the present invention and examples of PPI's include but are not limited to omeprazole (disclosed in U.S. Pat. No. 4,508,905, herein incorporated by reference), lansoprazole (disclosed in U.S. Pat. No. 4,628,098, herein incorporated by reference), pantoprazole (disclosed in U.S. Pat. No. 4,758, 579, herein incorporated by reference), tenatoprazole (disclosed in U.S. Pat. No. 4,808,596, herein incorporated by reference), and iloprazole (disclosed in U.S. Pat. No. 5,703, 097, herein incorporated by reference), as well as any salts or enantiomers of the foregoing.

The threshold amount of the PPI in either the first or second dose should raise the plasma levels of the PPI to at least 100 ng/ml. Preferably, the amount of drug in the first and second dose is sufficient to raise the plasma concentration above 200 ng/ml, more preferably above 300 ng/ml, even more preferably above 400 ng/ml, and most preferably above 500 ng/ml. Based upon the published clinical literature and skill in the art, those skilled in the art can readily determine the milligram amounts of any particular PPI that should be included in the first and second dose of the PPI to raise plasma levels to the thresholds mentioned above.

The benefits of this invention are not limited to a particular type of dosage form having a specific mechanism of drug release. The enhanced efficacy in alleviating nocturnal breakthrough events can be obtained with any dosage form suitable for releasing a PPI such that, for example, a modified release of the drug meets the threshold criteria mentioned above. In view of the discovery of the threshold level, the method of delivery of the PPI is a matter of choice for those skilled in the art.

As a general matter, however, there are two types of modified drug release. Specifically, release is controlled or extended release, and pulsed release. There are three types of formulations commonly used as controlled release dosage forms which include, matrix systems, osmotic pumps, and membrane controlled systems (also referred to as reservoir systems). Each of these systems is described in greater detail below. A detailed discussion of such dosage forms may also be found in: (i) Handbook of pharmaceutical controlled release technology, ed. D. L. Wise, Marcel Dekker, Inc. New York, N.Y. (2000), and (ii) and Treatise on controlled drug

3

delivery, fundamentals, optimization, and applications, ed. A. Kydonieus, Marcel Dekker, Inc. New York, N.Y. (1992).

Matrix systems are well known in the art. In a matrix system, the drug is homogenously dispersed in a polymer and optionally conventional excipients. This so-called admixture is typically compressed under pressure to produce a tablet. Drug is released from this tablet by diffusion and erosion. Matrix systems typically employ a pharmaceutically acceptable polymer such as a water-soluble hydrophilic polymer, or a water insoluble hydrophobic polymer (including waxes). Examples of suitable water soluble polymers include polyvinylpyrrolidine, hydroxypropylcellulose, hydroxypropylmethyl cellulose, methyl cellulose, vinyl acetate copolymers, polysaccharides (such as alginate, xanthum gum, etc.), polyethylene oxide, methacrylic acid copolymers, maleic anhydride/methyl vinyl ether copolymers and derivatives and mixtures thereof. Examples of suitable water insoluble polymers include acrylates, cellulose derivatives such ethylcellulose or cellulose acetate, polyethylene, methacrylates, acrylic acid copolymers and high molecular weight polyvinylalcohols. Examples of suitable waxes include fatty acids and glycerides.

The composition of the invention also typically includes pharmaceutically acceptable excipients. As is well known to those skilled in the art, pharmaceutical excipients are routinely incorporated into solid dosage forms. This typically is done to ease the manufacturing process as well as to improve the performance of the dosage form. Common excipients include diluents or bulking agents, lubricants, binders, etc.

Diluents, or fillers, can be added to, for example, increase the mass of an individual dose to a size suitable for tablet compression. Suitable diluents include, for example, powdered sugar, calcium phosphate, calcium sulfate, microcrystalline cellulose, lactose, mannitol, kaolin, sodium chloride, dry starch, and sorbitol.

Lubricants are incorporated into a formulation for a variety of reasons. They reduce friction between the granulation and die wall during compression and ejection. This prevents, for example, the granulate from sticking to the tablet punches, and facilitates its ejection from the tablet punches. Examples of suitable lubricants include talc, stearic acid, vegetable oil, calcium stearate, zinc stearate, and magnesium stearate.

Glidant's can also be incorporated into a formulation, typically for purposes of improving the flow characteristics of the granulation. Examples of suitable glidant's include talc, silicon dioxide, and cornstarch.

Binders also may be incorporated into the formulation. Binders are typically utilized if the manufacture of the dosage form uses a granulation step. Examples of suitable binders include povidone, polyvinylpyrrolidone, xanthan gum, cellulose gums such as carboxymethylcellulose, methyl cellulose, hydroxypropylmethylcellulose, hydroxycellulose, gelatin, starch, and pregelatinized starch.

Other excipients that may be incorporated into the formulation include preservatives, antioxidants, or any other pharmaceutically acceptable excipient commonly used in the pharmaceutical industry.

The amount of excipients used in the formulation will correspond to that typically used in a matrix system. The total amount of excipients, fillers and extenders and the like typically will vary from about 10% to about 80% by weight of the dosage form.

The matrix formulations are generally prepared using standard techniques well known in the art. Typically, they are prepared by dry blending the polymer, filler, drug, and other excipients followed by granulating the mixture using an alcohol until proper granulation is obtained. The granulation is

4

done by methods known in the art. The wet granules are dried in a fluid bed dryer, sifted and ground to appropriate size. Lubricating agents are mixed with the dried granulation to obtain the final formulation.

In an osmotic pump system, a tablet core is encased by a semipermeable membrane having at least one orifice. The semipermeable membrane is permeable to water, but impermeable to the drug. When the system is exposed to body fluids, water will penetrate through the semipermeable membrane into the tablet core containing osmotic excipients and the active drug. Osmotic pressure increases within the dosage form and drug is released through the orifice in an attempt to equalize pressure.

In more complex pumps, the tablet core contains multiple internal compartments. For example, the first compartment may contain the drug and the second compartment may contain a polymer, that swells on contact with fluid. After ingestion, this polymer swells into the drug containing compartment at a predetermined rate and forces drug from the dosage form at that rate. Such dosage forms are often used when are zero order release profile is desired.

Osmotic pumps are well known in the art and have been described in the literature. U.S. Pat. Nos. 4,088,864; 4,200,098; and 5,573,776; all of which are hereby incorporated by reference, describe osmotic pumps and methods for their manufacture. Osmotic pumps containing compounds, such as omeprazole, have been described in U.S. Pat. No. 5,178,867, the contents of which are hereby incorporated by reference.

As a general guideline, osmotic pumps are typically formed by compressing a tablet of an osmotically active drug (or an osmotically inactive drug in combination with an osmotically active agent or osmagent) and then coating the tablet with a semipermeable membrane which is permeable to an exterior aqueous-based fluid but impermeable to the passage of drug and/or osmagent. One or more delivery orifices may be drilled through the semipermeable membrane wall. Alternatively, orifice(s) through the wall may be formed in situ by incorporating leachable pore forming materials in the wall. In operation, the exterior aqueous based fluid is imbibed through the semipermeable membrane wall and contacts the drug and/or salt to form a solution or suspension of the drug. The drug solution or suspension is then pumped out through the orifice as fresh fluid is imbibed through the semipermeable membrane.

As previously mentioned, osmotic pumps may contain multiple distinct compartments. The first compartment may contain the drug as described above, and the second compartment may contain an expandable driving member consisting of a layer of a swellable hydrophilic polymer, which operates to diminish the volume occupied by the drug, thereby delivering the drug from the device at a controlled rate over an extended period of time. Alternatively, the compartments may contain separate doses of the drug.

Typical materials for the semipermeable membrane include semipermeable polymers known to the art as osmosis and reverse osmosis membranes, such as cellulose acylate, cellulose diacylate, cellulose triacylate, cellulose acetate, cellulose diacetate, cellulose triacetate, agar acetate, amylose triacetate, beta glucan acetate, acetaldehyde dimethyl acetate, cellulose acetate ethyl carbamate, polyamides, polyurethanes, sulfonated polystyrenes, cellulose acetate phthalate, cellulose acetate methyl carbamate, cellulose acetate succinate, cellulose acetate dimethyl aminoacetate, cellulose acetate ethyl carbamate, cellulose acetate chloracetate, cellulose dipalmitate, cellulose dioctanoate, cellulose dicaprylate, cellulose dipentanlate, cellulose acetate valerate, cellulose acetate succinate, cellulose propionate succinate, methyl cel-

5

lulose, cellulose acetate p-toluene sulfonate, cellulose acetate butyrate, cross-linked selectively semipermeable polymers formed by the coprecipitation of a polyanion and a polycation as disclosed in U.S. Pat. Nos. 3,173,876; 3,276,586; 3,541,005; 3,541,006; and 3,546,142, semipermeable polymers as disclosed by Loeb and Sourirajan in U.S. Pat. No. 3,133,132, lightly cross-linked polystyrene derivatives, cross-linked poly(sodium styrene sulfonate), poly(vinylbenzyltrimethyl ammonium chloride), cellulose acetate having a degree of substitution up to 1 and an acetyl content up to 50%, cellulose diacetate having a degree of substitution of 1 to 2 and an acetyl content of 21 to 35%, cellulose triacetate having a degree of substitution of 2 to 3 and an acetyl content of 35 to 44.8%, as disclosed in U.S. Pat. No. 4,160,020.

The osmotic agent present in the pump, which may be used when the drug itself is not sufficiently osmotically active, are osmotically effective compounds soluble in the fluid that enters the pump, and exhibits an osmotic pressure gradient across the semipermeable wall against the exterior fluid. Osmotically effective osmagents useful for the present purpose include magnesium sulfate, calcium sulfate, magnesium chloride, sodium chloride, lithium chloride, potassium sulfate, sodium carbonate, sodium sulfite, lithium sulfate, potassium chloride, sodium sulfate, d-mannitol, urea, sorbitol, inositol, raffinose, sucrose, glucose, hydrophilic polymers such as cellulose polymers, mixtures thereof, and the like. The osmagent is usually present in an excess amount, and it can be in any physical form, such as particle, powder, granule, and the like. The osmotic pressure in atmospheres of the osmagents suitable for the invention will be greater than zero and generally up to about 500 atm, or higher.

The expandable driving member typically is a swellable, hydrophilic polymer which interacts with water and aqueous biological fluids and swells or expands to an equilibrium state. The polymers exhibit the ability to swell in water and retain a significant portion of the imbibed water within the polymer structure. The polymers swell or expand to a very high degree, usually exhibiting a 2 to 50 fold volume increase. The polymers can be noncross-linked or cross-linked. The swellable, hydrophilic polymers are in one presently preferred embodiment lightly cross-linked, such cross-links being formed by covalent ionic bonds or hydrogen bonds. The polymers can be of plant, animal or synthetic origin. Hydrophilic polymers suitable for the present purpose include poly (hydroxy alkyl methacrylate) having a molecular weight of from 30,000 to 5,000,000; kappa carrageenan, polyvinylpyrrolidone having molecular weight of from 10,000 to 360,000; anionic and cationic hydrogels; polyelectrolyte complexes; poly(vinyl alcohol) having a low acetate residual, crosslinked with glyoxal, formaldehyde, or glutaraldehyde and having a degree of polymerization from 200 to 30,000; a mixture of methyl cellulose; cross-linked agar and carboxymethyl cellulose; a water insoluble, water swellable copolymer produced by forming a dispersion of finely divided copolymer of maleic anhydride with styrene, ethylene, propylene, butylene or isobutylene cross-linked with from 0.001 to about 0.5 moles of saturated cross-linking agent per mole of maleic anhydride in copolymer; water swellable polymers of N-vinyl lactams, and the like.

The expression "orifice" as used herein comprises means and methods suitable for releasing the drug from an osmotic system. The expression includes one or more apertures or orifices which have been bored through the semipermeable membrane by mechanical procedures. Alternatively it may be formed by incorporating an erodible element, such as a gelatin plug, in the semipermeable membrane. In cases where the semipermeable membrane is sufficiently permeable to the

6

passage of drug, the pores in the membrane may be sufficient to release the PPI in amounts sufficient to meet the plasma threshold. In such cases, the expression "passageway" refers to the pores within the membrane wall even though no bore or other orifice has been drilled there through. A detailed description of osmotic passageways and the maximum and minimum dimensions for a passageway are disclosed in U.S. Pat. Nos. 3,845,770 and 3,916,899, the disclosures of which are incorporated herein by reference.

The osmotic pumps of this invention are manufactured by standard techniques. For example, in one embodiment, the drug and other ingredients that may be housed in one area of the compartment adjacent to the passageway, are pressed into a solid possessing dimension that corresponds to the internal dimensions of the area of the compartment the agent will occupy, or the agent and other ingredients and a solvent are mixed into a solid or semisolid form by conventional methods such as ballmilling, calendaring, stirring or rollmilling, and then pressed into a preselected shape. Next, a layer of a hydrophilic polymer is placed in contact with the layer of agent in a like manner, and the two layers surrounded with a semipermeable wall. The layering of agent formulation and hydrophilic polymer can be fabricated by conventional two-layer press techniques. The wall can be applied by molding, spraying or dipping the pressed shapes into a wall forming material. Another and presently preferred technique that can be use for applying the wall is the air suspension procedure. This procedure consists of suspending and tumbling the pressed agent and dry hydrophilic polymer in a current of air and a wall forming composition until the wall is applied to the agent-hydrophilic polymer composite. The air suspension procedure is described in U.S. Pat. No. 2,799,241; J. Am. Pharm. Assoc., Vol. 48, pp. 451-459, (1979). Other standard manufacturing procedures are described in Modern Plastics Encyclopedia, Vol. 46, pp. 62-70 (1969); and in Pharmaceutical Sciences, by Remington, Fourteenth Edition, pp. 1626-1678 (1970), published by Mack Publishing Company, Easton, Pa.

Reservoir systems also are well known in the art. This technology is also commonly referred to as microencapsulation, bead technology, or coated tablets. Small particles of the drug are encapsulated with pharmaceutically acceptable polymer. This polymer, and its relative quantity, offers a predetermined resistance to drug diffusion from the reservoir to the gastrointestinal tract. Thus drug is gradually released from the beads into the gastrointestinal tract and provides the desired sustained release of the compound.

These dosage forms are well known in the art. U.S. Pat. Nos. 5,286,497 and 5,737,320, both of which are hereby incorporated by reference, describe such formulations and their methods of production. U.S. Pat. Nos. 5,354,556, 4,952,402, and 4,940,588, all of which are hereby incorporated by reference, specifically discuss using such technology to produce sustained release dosage forms. As further guidance, however, a pellet is formed with a core of a drug, optionally in association with conventional excipients. This core is then coated with one, or more, pharmaceutically acceptable polymers. Often, the coating polymer is an admixture of a major proportion of a pharmaceutically acceptable water insoluble polymer and a minor proportion of a pharmaceutically acceptable water soluble polymer.

The central core may be prepared by a number of techniques known in the art. Typically the drug is bound to an inert carrier with a conventional binding agent. The inert carrier is typically a starch or sugar sphere. Before the drug is bound to the inert carrier, it is typically blended with conventional excipients to expedite its handling and to improve the prop-

US 8,461,187 B2

**7**

erties of the final dosage form. These excipients are identical to those described above for the matrix systems. The quantity of these excipients can vary widely, but will be used in conventional amounts. The central core is then produced by utilizing a binding agent to attach the powdered drug blend to the solid carrier. This can be accomplished by means known in the art for producing pharmaceutical beads. Suitable means include utilization of a conventional coating pan, an automatic coating machine, or a rotogranulator. The production of these central cores is described in more detail in Pharmaceutical Pelletization Technology, ed. I. Ghebre-Sellassie, Marcel Dekker, Inc. New York, N.Y. (1989).

The second major component of a reservoir system is the polymeric coating. As noted above, the polymeric coating is responsible for giving the beads their release characteristics. The polymeric coating may be applied to the central core using methods and techniques known in the art. Examples of suitable coating devices include fluid bed coaters and pan coaters. The application techniques are described in more detail in: i) Aqueous polymeric coatings for pharmaceutical dosage forms, ed. J. W. McGinity, Marcel Dekker, Inc. New York, N.Y. (1997); and ii) Pharmaceutical Dosage Forms: Tablets Vol. 3. ed. H. A. Lieberman, L. Lachman and J. B. Schwartz, Marcel Dekker, Inc. New York, N.Y. pp. 77-287, (1990.

Examples of suitable polymers include ethylcellulose, cellulose acetate, cellulose propionate (lower, medium or higher molecular weight), cellulose acetate propionate, cellulose acetate butyrate, cellulose acetate phthalate, cellulose triacetate, poly(methyl methacrylate), poly(ethyl methacrylate), poly(butyl methacrylate), poly(isobutyl methacrylate), poly (hexyl methacrylate), poly(isodecyl methacrylate), poly(lauryl methacrylate), poly(phenyl methacrylate), poly(methyl acrylate), poly(isopropyl acrylate), poly(isobutyl acrylate), poly(octadecyl acrylate), poly(ethylene), poly(ethylene) low density, poly(ethylene) high density, poly(propylene), poly (ethylene oxide), poly(ethylene terephthalate), poly(vinyl isobutyl ether), poly(vinyl acetate), poly(vinyl chloride) or polyurethane or mixtures thereof.

Once the beads have been prepared, they may be filled into capsules as is known in the art. Alternately, they may be pressed into tablets using techniques conventional in the art.

Pulsed release systems, the other broad category of modified release dosage forms, are also well known in the art. Pulsed release systems generally involve a first drug release and a second drug release separated by a predetermined period of time or site of release. Pulsed release systems also may include a combination of immediate release and extended release. Multiple formulation configurations are suitable for pulsed release dosage forms.

For example, osmotic pumps also are suitable for purposes of pulsatile drug release and have been described in U.S. Pat. Nos. 5,017,381 and 5,011,692, both of which are herein incorporated by reference. Generally, the osmotic pump containing the drug is formed and then overcoated with a layer of a drug to provide for two releases of the drug, one from the coating layer and another from the osmotic pump.

Particle or granule systems have also been proposed for purposes of providing a pulsed release of drug. U.S. Pat. No. 6,228,398 (incorporated herein by reference) teach the use of such systems for a pulsed release of a drug. Such systems typically use distinct populations of drug containing particles to achieve a pulsed release. The populations employ different coating polymers, such as those mentioned above, to release the drug at different points in time or location. For example, polymers having different dissolution pHs are commonly used for this purpose. Hence, one population of granules can

**8**

be coated with a polymer that begins dissolving at a pH of 6 and another population of granules can be coated with a polymer that begins dissolving at a pH of 6.5 to achieve a pulsed release. In this manner, the first population of granules would release the drug in the upper small intestine while the second population of the granules would release the drug further down stream and therefore at a later time.

It will be understood, of course, that any of the dosage forms used in accordance with the present invention may employ an enteric coating or buffering systems such as those described in U.S. Pat. Nos. 6,849,346; 5,026,560; 5,045,321; 4,786,505; and 6,849,346 (all of which are herein incorporated by reference) for purposes of protecting the PPI.

The compositions of the invention can be administered orally in the form of tablets, pills, or the granulate may be loose filled into capsules. The tablets can be prepared by techniques known in the art and contain a therapeutically effective amounts of the PPI compound and such excipients as are necessary to form the tablet by such techniques. Tablets and pills can additionally be prepared with enteric coatings and buffering systems such as those described above to protect the PPI. The coating may be colored with a pharmaceutically accepted dye. The amount of dye and other excipients in the coating liquid may vary and will not impact the performance of the extended release tablets. The coating liquid generally comprises film forming polymers such as hydroxypropyl cellulose, hydroxypropylmethyl cellulose, cellulose esters or ethers (such as cellulose acetate or ethylcellulose), an acrylic polymer or a mixture of polymers. The coating solution is generally an aqueous solution or an organic solvent further comprising propylene glycol, sorbitan monoleate, sorbic acid, fillers such as titanium dioxide, a pharmaceutically acceptable dye.

One skilled in the art, taking into account above teachings will readily be able to formulate oral dosage forms containing a PPI that is released in accordance with the threshold concentrations, also taught above. Thus, for example, when a controlled or extended release formulation is employed, the drug should be released such that the plasma concentration threshold is met during the period the drug is released. Hence, when a extended release formulation is employed according to the present invention, there is a continuous release of the first and second dose of the PPI, and preferably, the plasma level of PPI is maintained above the threshold level during at least part of the combined release of the first and second dose of PPI. Alternatively, when a pulsed release dosage form is employed, the first and second pulses of the drug independently should be sufficient to increase the plasma level concentration above the threshold level.

The specific therapeutically effective dose level for any particular patient will depend upon a variety of factors including the disorder being treated and the severity of the disorder; the activity of the specific compound employed; the specific composition employed; the age, body weight, general health, sex and diet of the patient; the time of administration, and rate of excretion of the specific compound employed; the duration of the treatment; drugs used in combination or coincidental with the specific compound employed; and other factors known to those of ordinary skill in the medical arts. For example, it is well within the skill of the art to start doses of the compound at levels lower than required to achieve the desired therapeutic effect and to gradually increase the dosage until the desired effect is achieved.

Formulations of the invention are administered and dosed in accordance with sound medical practice, taking into account the clinical condition of the individual patient, the site and method of administration, scheduling of administra-

US 8,461,187 B2

9                                                                10

tion, and other factors known to medical practitioners. As further guidance, however, in cases where a pulsed release dosage form is employed, drug loading for each pulse is independently and typically between 5 mg and 300 mg, more typically between 20 mg and 200 mg. In cases where an extended release dosage form is employed, typical drug loading for the combined first and second PPI dose in such a formulation will be in the range of 50 mg to 1000 mg, and more typically 75 mg to 500 mg.

It has also been discovered, that due to the decreasing absorption in the downstream portions of the gastrointestinal tract, it is preferred to load the dosage forms with the PPI such that the second dose is higher than the first dose of the PPI. Hence, in a pulsed release dosage form the second dose is at least 10% more than the first dose, more preferably, the second dose is at least 50% more than the first dose, even more preferably, the second dose is at least 100% to 200% more than the first dose, and most preferably the second dose is at least 200% to 900% more than the first dose. In continuous release dosage forms of the present invention, the increased second dose is reflected in the total drug loading ranges mentioned above.

In cases where the PPI is delivered in pulses, the period between when the first dose begins to be release and when the second dose begins to be released can be separated by varying amounts of time. Preferably, the onset of release of the doses are separated by between 2 hours and 20 hours, more preferably between 3 hours and 16 hours and most preferably between 4 hours and 12 hours. Of course, any of the pulses released from such a dosage form should achieve the threshold concentration and maintain plasma concentrations above such threshold for at least 30 minutes, preferably one hour to 2 hours, and more preferably between 2 hours to 8 hours. In cases where there is no time separating the pulses, or when the release of the PPI is delivered in an extended or continuous form, the time period for release is also variable but preferably the release is provided over the course of 4 hours to 8 hours, more preferably 3 hours to 12 hours and most preferably 2 hours to 20 hours. Additionally, during this release it is preferable to hold the plasma concentration above a threshold level for at least 4 hours, more preferably at least 6 hours, even more preferably at least 8 hours and most preferably for at least 12 hours.

"Therapeutically effective amounts or dose levels" for purposes herein can readily be determined by such considerations as are known in the art. The amount should be effective to achieve improvement, including but not limited to, raising of gastric pH, reduced gastrointestinal bleeding, reduction in the need for blood transfusions, improved survival rate, more rapid recovery, and/or improvement/elimination of symptoms and other indicators as are selected as appropriate measures by those skilled in the art.

"Pharmaceutically acceptable" as used herein includes moieties or compounds that are, within the scope of sound medical judgment, suitable for use in contact with the tissues of humans and lower animals without undue toxicity, irritation, allergic response, and the like, and are commensurate with a reasonable benefit/risk ratio.

It will be understood, of course, that dosage forms formulated according to the present invention can be tested empirically in animal and/or human models to determine the appropriate pK parameters resulting from a given formulation.

The formulation can be administered to those patients who are in need of PPI therapy such as those experiencing any of the maladies for which PPIs are indicted for use. For example, patients experiencing gastrointestinal disorders such as acid reflux disease, gastro-esophogeal reflux disease, peptic or

duedonal ulcers, Zollinger Ellison Syndrome can be treated to alleviate such disorders by administering the formulation of the present invention to such patients. Advantageously, the dosage form provided herein diminishes the likelihood of nocturnal breakthrough events and therefore also provides a method for mitigating nocturnal breakthrough events.

The following examples are provided to further illustrate the present invention and not intended to limit the invention.

EXAMPLES

Example 1

Threshold Level Modeling

Plasma concentration data obtained following administration of single intravenous doses of lansoprazole in humans was modeled to establish threshold concentrations above which a PPI is effective. Initially, gastric pH measured over the five hours post dosing (under fasting conditions) was plotted as a function of plasma concentration. However, no direct relationship between the gastric pH and the drug's plasma concentration could be established. In effect, plotting the data using these parameters resulted in a counter clockwise loop. An effect compartment model was then used in an attempt to delineate a useful relationship between drug concentration and effect. Accordingly, a model was proposed where a PK compartment was linked to a separate effect compartment. This model proved successful in delineating a trend between intragastric pH and concentration using a small effect compartment linked to the PK compartment. Using the same intravenous data, the pharmacological effect was modeled using sigmoid Emax model and PK was modeled using the two compartment model. The modeling first established the pharmacokinetic characteristics of lansoprazole, then the relationship between drug plasma concentration and intragastric pH was established, and pharacodynamic parameter estimates were obtained. The modeling provided the graph shown in FIG. 1 where the effect compartment concentration (assumed to be the same as the plasma concentration at steady-state) is on the x-axis and gastric pH on the y-axis. As shown by the graphic representation of the modeling, the effect of the drug (rise above baseline) begins at concentrations above, approximately, 100 ng/ml and levels off at concentrations above, approximately, 450 ng/ml. Hence, it was determined that the threshold concentration of approximately 100 ng/ml should be attained for purposes of attaining a minimum change in the desired pharmacological effect from baseline.

Example 2

Site of Absorption Study

This was a Phase 1, open-label, non-randomized, four-period, single-dose, crossover study in 8 healthy adult males. An extemporaneous formulation containing crushed lansoprazole granules from lansoprazole delayed-release capsules (30 mg) mixed with sodium bicarbonate, starch and a radioactive marker were administered to the study subjects via a remote control capsule. This remote control capsule was comprised of a non-digestible shell capable of holding a drug powder, a release mechanism, and a magnetic receiver that receives an external signal. Upon receiving a remote signal during Periods 1, 2, and 3, the capsule released it's contents in the pre-designated site within the GI tract (see table 1 below). A lansoprazole delayed-release 30 mg capsule with starch

**11**

and a radioactive marker were administered orally during Period 4 and were used as a bioavailability reference.

Indium-111 chloride ($^{111}$In-chloride) was used as the radioactive marker in the test formulation that was filled into remote control capsule. Each subject also received a second radioisotope, technetium-99m DTPA ($^{99m}$Tc-DTPA), in the water used to swallow the InteliSite Companion capsule. Since the radioisotopes are not absorbed, progress of the formulation through the GI tract was monitored using a gamma camera that captures images at frequent intervals after ingestion of the dose. The radioisotope in the water outlined or "mapped" the GI tract to delineate the targeted site of drug release. Each subject received a single oral dose during each dosing period (fixed sequence) as shown in the table 1 below.

TABLE 1

| Period | Location | Formulation |
|---|---|---|
| 1 | Cecum/colon | Lansoprazole (30 mg) powder blended with sodium bicarbonate (90.0 mg) in recmote control capsule |
| 2 | Distal small intestine | Lansoprazole (30 mg) powder blended with sodium bicarbonate (90.0 mg) in remote control capsule |
| 3 | Proximal small intestine | Lansoprazole (30 mg) powder blended with sodium bicarbonate (90.0 mg) in remote control capsule |
| 4 | Reference (Stomach) | Lansoprazole (30 mg) delayed release capsule |

The study consisted of 4 dosing periods with a 7-day minimum washout interval between capsule administration in each period. All subjects were confined for up to 3 days in each period; confinement continued 24 hours after the drug was released from the remote control capsule. Serial blood samples were taken following drug release to determine segmental absorption and pharmacokinetics of lansoprazole.

Blood samples were obtained on Study Day 1 of each period prior to dosing and just before the investigational product was released from remote control capsule (0 Hour) and at 0.25, 0.5, 0.75, 1, 1.5, 2, 4, 6, 8, 12, 16 and 24 hours after release of lansoprazole in the selected segment of the GI tract. Blood samples for evaluation of lansoprazole pharmacokinetics following administration of lansoprazole 30 mg delayed release capsule were collected at the same timepoints as the remote control capsule. Timing for the pharmacokinetic samples were relative to time of release in the GI tract for the remote control capsule doses or relative to time of administration for the delayed release capsule.

The relative bioavailability of lansoprazole delivered to the proximal small intestine, distal small intestine, or colon compared to the delayed release lansoprazole capsule was calculated as the ratios of AUC$_\infty$ for different GI regions to that of the delayed release capsule. In addition, the relative bioavailability of lansoprazole delivered to the distal small intestine and colon compared to the proximal small intestine was calculated.

The rate and extent of absorption for lansoprazole from the distal small intestine were less than those obtained for the proximal intestine, although the absorptions were comparable. The extent of absorption was reduced when lansoprazole was directly delivered to the colon, the relative bioavailability of lansoprazole from the colon compared to the lansoprazole delayed release capsule was between approximately 10% to 60%.

While the invention has been described in detail and with reference to specific embodiments, it will be apparent to one

**12**

skilled in the art that various changes and modifications may be made to such embodiments without departing from the spirit and scope of the invention.

What is claimed is:

1. A dosage form comprising a PPI wherein the PPI is released from the dosage form as a first and a second dose, wherein the first and second doses are released from the dosage form as discreet pulses of the PPI separated by a period of time, wherein the second dose contains at least 10% more of the PPI than the first dose, and wherein each of the first and second doses comprise a sufficient amount of the PPI to raise plasma levels of the PPI to a threshold concentration of at least 100 ng/ml.

2. The dosage form of claim 1 wherein the second dose begins to be released between 2 and 20 hours after the first dose begins to be released.

3. The dosage form of claim 1 wherein the second dose begins to be released between 3 hours and 16 hours after the first dose begins to be released.

4. The dosage form of claim 1 wherein the second dose begins to be released between 4 hours and 12 hours after the first dose begins to be released.

5. The dosage form of claim 1 wherein each pulse of the PPI is sufficient to maintain plasma concentrations above the threshold concentration for at least 30 minutes.

6. A method of treating a gastrointestinal disorder comprising administering to a patient in need of such therapy the dosage form of claim 1.

7. The method of claim 6 wherein the first and second dose are released from the dosage form as discreet pulses of the PPI and the second dose begins to be released between 2 and 20 hours after the first dose begins to be released.

8. The method of claim 7 wherein the second dose contains at least 10% more of the PPI than the first dose.

9. The method of claim 6 wherein the first dose of the PPI and the second dose of the PPI are released continuously such that there is a extended release of the PPI for a period between 2 and 20 hours and the plasma level concentration of the PPI is maintained above 100 ng/ml for at least 4 hours.

10. The dosage form of claim 1 wherein the second dose contains at least 50% more than the first does.

11. The dosage form of claim 1 wherein the second dose contains at least 100% to 200% more than the first dose.

12. The dosage farm of claim 1 wherein the second dose contains at least 200% to 900% more than the first dose.

13. The dosage form of claim 1 wherein the first and second doses independently comprise between 5 mg and 300 mg of the PPI.

14. The dosage form of claim 1 wherein the first and second doses independently comprise between 20 mg and 200 mg of the PPI.

15. The dosage form of claim 1 wherein each of the first and second doses comprise a sufficient amount of the PPI to raise plasma levels of the PPI to a threshold concentration of at least 200 ng/ml.

16. The dosage form of claim 1 wherein each of the first and second doses comprise a sufficient amount of the PPI to raise plasma levels of the PPI to a threshold concentration of at least 450 ng/ml.

17. The dosage form of claim 1, wherein the period of time is between 2 hours and 20 hours.

18. The dosage form of claim 1, wherein the period of time is between 3 hours and 16 hours.

19. The dosage form of claim 1, wherein the period of time is between 4 hours and 12 hours.

* * * * *